R. Sidney **RUSSELL** and Patricia B. Russell, Plaintiffs-Respondents,

v.

Jess **ALLEN**, Defendant-Appellant.

No. 9201.

Missouri Court of Appeals, Springfield District.

June 4, 1973.

John W. Reid, II, Schnapp, Graham & Reid, Fredericktown, for defendant appellant.

L. Michael Lorch, William H. Pennington, Piedmont, for plaintiffs respondent.

HOGAN, Judge.

In this case, the trial court has permanently restrained and enjoined the defendant from going upon the plaintiffs' premises "and removing or attempting to remove therefrom any of the mining equipment ·located thereon". We have reviewed the case upon the law and the evidence, as required by Rule 73.01(d)[1], and bearing in mind that we should affirm the judgment unless our review of the entire evidence leaves us with the definite and firm conviction that a mistake has been committed, United States v. United States Gypsum Co., 333 U.S. 364, 394–395, 68 S.Ct. 525, 541–542 [14] [15] [16] [17], 92 L.Ed. 746, 765–766 (1947), and see Crosswhite v. State, 426 S.W.2d 67, 70–71 [1] (Mo. 1968), we nevertheless find ourselves unable to discover any basis for the issuance

---

1. References to statutes and rules are to RSMo 1969 and Missouri Rules of Court (1973), V.A.M.R., except where otherwise noted.

of a permanent injunction, and therefore reverse and remand the cause.

As it lies before us, the record is remarkable principally because of the informality with which the case was tried, and the contradictory if not downright incoherent nature of the testimony adduced from the witnesses called. No responsive pleadings of any nature were filed, but the cause was tried as if it were at issue; several material exhibits received in evidence without objection have been omitted from the record on appeal, and the briefs filed leave the parties' theories very obscure. We do not mean to engage in carping criticism of counsel's presentation, nor to disparage their efforts on behalf of their clients, but we would remind counsel that even in a court-tried case, the legal and factual issues on appeal should be presented with clarity sufficient to enable the appellate court to resolve those issues without becoming an advocate for either party. Schlanger v. Simon, 339 S.W.2d 825, 828 [1–3] (Mo. 1960); see also Pfotenhauer v. Ridgway, 307 Mo. 529, 534–535, 271 S.W. 50, 51–52 [5] [6] (1925).

As we glean the basic facts from the record, plaintiffs' predecessors in title and a corporation organized under the name Taft-Dow Mining Company, Inc., entered into a mineral lease on or about the 30th day of November, 1962. The lease grants the corporation the right to enter upon the property described (now owned by plaintiffs) "for the purpose of prospecting for, digging, quarrying, mining, concentrating and shipping [from the premises] all iron ore and other minerals, . . . and . . . to erect, construct, and maintain all roadways, . . . machinery, equipment, . . . and buildings necessary . . . to successfully and properly carry on business of mining and concentrating iron ore. . . ." The lease is drawn for a period of one year "and from term to term of like periods thereafter until all economical and commercial iron ore, and other minerals . . . shall have been *mined and removed*". The rent reserved is stated in terms of royalty, but as a mini-

mum, the lessee agrees to pay the lessors the sum of $1.00 per acre ($160 annually) on or before January 10 of each year. Paragraph ten of the lease, which is material in this case, provides:

> "10. Upon termination of this lease by expiration of its terms or in any other manner, Lessee, upon payment of all sums due hereunder, shall have a period of ninety (90) days from such termination within which to remove all buildins [sic], *fixtures, and structures of any nature whatsoever* placed upon said land by Lessee." (emphasis added)

The lease was acknowledged by Jessie Haley and Darden Haley, her husband, as lessors, and by a Mr. Rufus Bratton as president, and a Mr. Howard Bratton, as secretary, of the corporate lessee. It was filed for record in the Wayne County Recorder's office on December 11, 1962.

Apparently—though the record is far from clear on the point—the Taft-Dow Mining Company was incorporated by Mr. Rufus Bratton (hereinafter Mr. Bratton) and his brother Howard in order to acquire and operate two mines, or "mining plants", as Mr. Bratton referred to them. One mine is referred to as the "Taskee" plant, and the other the "Williamsville" plant, which was located on the land now occupied by the plaintiffs. In any case, it is inferable that the Taft-Dow Mining Company acquired title to the "Taskee" plant and purchased a large quantity of expensive mining and ore processing equipment from a corporation identified only as Granite City Steel Company. Mr. Bratton, at one point, testified that "[t]he intention me and my brother [had] was [to acquire] title to the two plants and [borrow] $30,000 in operating capital . . . to activate . . . these plants. It was to be secured by a corporate note and mortgage." Apparently the whole transaction was financed by Granite City Steel Company, which also loaned the Taft-Dow Mining Company $30,000 in operating capital. At some time, Granite City Steel was

given a chattel mortgage on all the equipment acquired by the original lessee, though the status of that mortgage was in dispute at the time of trial.

We are not advised how much mining, if any, was done on the plaintiffs' property—the "Williamsville" plant—but Mr. Bratton testified that in 1964, the Taft-Dow Mining Company ceased doing business and by agreement with his brother Howard, Mr. Bratton undertook to dispose of the corporation's assets, "try to liquidate it the best I could." By agreement dated January 4, 1965, the assets of the Taft-Dow Mining Company, Inc., were assigned and sold to a new corporation, Taft-Dow, Inc. This agreement was signed by Rufus Bratton as president of Taft-Dow Mining Company, Inc., by him and two brothers (and a Wilma Bratton) as "stockholders of Taft-Dow Mining Company", and by an individual whose name appears to have been Aris V. A. Valle as president of the successor corporation. Mr. Bratton's testimony was that the successor corporation defaulted soon after the assignment was executed, and that he required the successor corporation to halt its operations some time in 1967. Apparently, the equipment here in question has lain idle on plaintiffs' property since that time. Plaintiffs purchased the property from Mrs. Haley, who had remarried, in February, 1970. In December 1970, Mr. Bratton and his wife sold the lease and the mining equipment on the plaintiffs' property to defendant. The defendant removed part of the mining equipment, and advised plaintiffs that he intended to remove the rest of it. Plaintiffs consulted an attorney, who advised them that the equipment had, in his opinion, been abandoned. In his opinion, the lease was no longer in effect, and the attorney advised Mr. Allen that if he came upon plaintiffs' property to remove the mining machinery he would be arrested. This action followed.

The real controversy here is: Who has title to the mining equipment located on the plaintiffs' land? It has lain idle for several years, some of it has been removed and some of it needs repair, but it is valuable. The opinion of one experienced, if not expert, witness was that the whole lot was worth $25,000. The principal item involved is a rock crusher, which plaintiff Sidney Russell described as being "as big as this room" [apparently the courtroom]. It is set on a concrete pad, and would, in the opinion of one witness, be very expensive to move. There are other valuable items, but it is unnecessary to discuss the nature of the equipment piece by piece. The fact is that if this action could properly be regarded as an action to determine the title and right to possession of the personalty involved—and it cannot—the evidence is simply too contradictory and incoherent to determine to whom it properly belongs.

The plaintiffs seem to believe that since the mining equipment "came with the land", so to speak, and since it has lain idle for several years, it is to be considered abandoned. This approach overlooks the general rule that a deed to realty does not pass the title to personal property which has not acceded to the realty as a fixture, unless the personal property is mentioned in the deed,[2] and there is no proof or evidence tending to indicate that the mining machinery located on plaintiffs' property was included in the deed from their predecessors in title. It is the objective intention of the annexor or purported annexor at the time of attachment which determines whether or not a chattel has become part of the land, Bastas v. McCurdy, 266 S.W.2d 49, 52 [9] (Mo. App. 1954); 5 American Law of Property § 19.6, p. 26 (A. J. Casner ed. 1952), and here, the only evidence of the parties' intention is the provision in the original lease that the lessee was to have the

2. McRoberts v. Moudy, 19 Mo.App. 26, 31 (1885) ; Giuliano Constr. Co. v. Simmons, 147 Conn. 441, 162 A.2d 511, 512 [1, 2] (1960) ; Wyman v. Hall, 84 Mont. 571, 276 P. 944, 945 [3, 4] (1929) ; 26 C.J.S. Deeds § 106(a), pp. 904–905 (1956).

right to remove *all* structures of any nature for a period of 90 days after the expiration of the lease. Such a provision, in our opinion, negates the idea that the annexor intended any of the machinery to accede to the realty, particularly when there is no evidence whatever to the contrary.

As for the suggestion that the machinery has been abandoned, it must be remembered that the question of abandonment is largely one of *intention*, and *abandonment of personal property will not be presumed if the conduct of the owner can be explained consistently with a continued claim. The burden of proof is upon him who asserts abandonment, and the proof must be clear and unequivocal.* Linscomb v. Goodyear Tire & Rubber Co., 199 F.2d 431, 435–436 (8th Cir. 1952). Mere nonuser does not constitute abandonment. Summers v. Atchison, T. & S. F. Ry. Co., 2 F.2d 717, 719 [4] (E.D.Mo.1924). Whoever may be the true owner and entitled to possession of the mining machinery involved here, there is certainly no evidence that any person having any semblance of an interest in it has intended to abandon it. Plaintiff Sidney Russell stated that a Mr. Jim Clark had tried to sell the equipment to him; defendant testified that Mr. Clark, plaintiff Patricia Russell and Mr. Bratton at various times had offered to sell the equipment to him. At another point in the trial, plaintiff Sidney Russell testified that "I have had several people claim they owned it." These repeated assertions of ownership are wholly inconsistent with any intention to abandon the property; the most that is shown is nonuser over a period of several years. Finally, plaintiffs' testimony directly contradicts their allegation in their petition that they are the rightful owners of the mining machinery. At the hearing on the permanent injunction, plaintiff Sidney Russell was asked: "Now . . . is it still your posi-

tion and statement to the court that if a lawful owner of this property were to come along and prove that lawful ownership to you that you would not be opposed to surrending [sic] that property?" Mr. Russell answered: "If anybody can prove that they own that property, well, I wouldn't object to it." Mr. Russell was further asked if it would be proper to say "that you just don't want to let somebody come and haul the property off simply because they say they owned it," and he answered most unresponsively by saying, "I have had several people claim they owned it."

The defendant's testimony is no more enlightening. At the hearing on the preliminary injunction, Mr. Allen said that four different people had offered to sell him the mining machinery, but Mr. Bratton had given him a "history" of the corporate acquisition of the property, the subsequent sale to a successor corporation, the successor's default, and had shown the defendant "[b]ills of sale, purchase agreements, [and] court records." Defendant had none of those documents, but thought "Mr. Bratton or my attorney can probably come up with them." The defendant had finally paid Mr. Bratton the sum of $3,400 for all the mining machinery located at both plants, and had refused plaintiffs' offer to sell it to him because, "[i]n my opinion, it belonged to Mr. Bratton and [plaintiffs] had no legal claim to it." Later, at the hearing on the permanent injunction, defendant testified that he had contacted a Mr. Clark,[3] who, Mr. Bratton said, "had an option" and Mr. Clark asked $150,000 for all the equipment. Mr. Clark eventually succeeded in selling his interest in the mining equipment, whatever it was, to defendant for $2,500. Pressed for the details of his purchase of the equipment, defendant said that he bought it "with three years labor for $3,400.00, $1,600.00, $2,500.00 and a great deal of work with obligations on it. At the time I bought it," defendant contin-

3. Mr. Clark seems to have been an officer or shareholder in the Taft-Dow corporation, to which the Brattons sold, or attempted to sell, the assets of their defunct corporation.

ued, "there was an additional mortage to Granite City for $14,000.00 which at first agreement states it is legally enforceable if it is in existence then I agreed to pay it." Defendant had been in contact with a Mr. Gulley at Granite City Steel three or four times. He testified that Mr. Bratton had also written Granite City, but had been notified only that "we are taking it under advisement." Defendant admitted that the machinery "possibly" had a "lien of $14,000.00."

Mr. Bratton's evidence at the hearing on the preliminary injunction was that he had sold the mining equipment to the defendant, but he further stated although he had an "interest" in the mining equipment, he "didn't know [himself] to what extent." Mr. Bratton attempted to clarify the confused and rather complicated course of events leading up to the sale of the equipment to the defendant, but with deference, his testimony sheds very little light on the matters in controversy. Mr. Bratton was asked, for example, if the Taft-Dow Mining Company, Inc., owed any money to Granite City Steel Company at the time it ceased operations, and he answered, "Yes, of course, that sale and loan agreement I satisfied in making the agreement with these people that I had assigned to take that over, which I made agreeable with Granite City." The "sales and loan agreement" to which Mr. Bratton referred is not of record, and Mr. Bratton's further evidence was that the successor corporation to whom the equipment had been assigned had defaulted in the performance of its agreement, and he gave it as his opinion that he "retained [ownership], that is due to the fact that they [the successor corporation] did not pay all the sum they started to pay." At the hearing on the permanent injunction, Mr. Bratton's testimony was that he had sold, and had intended to sell "whatever interest I might have" to the defendant, but gave it as his opinion (received without objection) that he had "complete interest except for one

chattel mortgage that was on it in favor of Granite City Steel Company." This is not, nor does it purport to be, a complete summary of the evidence, but it does demonstrate, at least in our opinion, that if the real issues presented had been susceptible of resolution in an action for an injunction, a permanent injunction should not have issued simply because such relief should not be granted when the right thereto is doubtful. American Pamcor, Inc. v. Klote, 438 S.W.2d 287, 288 [2] (Mo.App.1969) ; Barnhart v. Ripka, 297 S.W.2d 787, 792 [10] (Mo.App.1956).

More importantly, it is evident that what the parties have actually done here is to convert an action for an injunction into a suit in replevin. As we have noted, the real matter in controversy is the title to the mining machinery now located on the plaintiffs' land, principally the rock crusher. The rock crusher is large—as noted, plaintiff described it as being "about as big as this room", and said that it was set on a concrete pad. Apparently, plaintiffs' original theory was that the rock crusher and some of the other items were fixtures, and it may be granted that in a proper case, an injunction may issue to prevent the wrongful removal of a fixture, although the usual remedy is an action for damages. State Savings Bank v. Kercheval, 65 Mo. 682, 688–689 (1877) ; 35 Am.Jur.2d Fixtures, §§ 128, 131, pp. 797, 799 (1967). If the evidence had established that the parties to the original lease intended the rock crusher, or for that matter, any of the machinery, to become a fixture, it might then be true that a court of equity could incidentally have adjudicated the title and right to possession of the other items in order to afford complete relief, but the general rule that equity, having once become possessed of a cause, will retain it to afford complete relief does not apply when the facts relied on to sustain the equitable jurisdiction are not established. Wimer v. Wagner, 323 Mo. 1156, 1169, 20 S.W.2d 650, 654 [12], 79 A.L.R. 1231, 1239 (1929).

**296**

We bear clearly in mind that forms of action, strictly speaking, have been abolished, Rule 42.01; Service Constr. Co. v. Nichols, 378 S.W.2d 283, 288 [4] (Mo.App.1964), and that with some limitation, when issues not raised by the pleadings are tried by express or implied consent of the parties they are to be treated as if they had been raised by the pleadings. Rule 55.54. Nevertheless, in this court-tried case, the basic issue before us is the propriety of the court's decision on the whole record, Russell v. Russell, 427 S.W. 2d 471, 475 [2] (Mo.1968), and in our opinion, if the issuance of a permanent injunction is to be sustained, there must be some record basis for the exercise of such equitable jurisdiction. On the record before us, plaintiffs had a plain, adequate and complete remedy at law, and in the particular circumstances of this case, no grounds for the issuance of a permanent injunction were demonstrated. Real Estate Inv. Co. v. Winn, 233 Mo.App. 26, 34, 116 S.W.2d 550, 555 [3] [4] [5] (1938), and see Weston v. Fisher, 180 S.W. 1038, 1039 [2] (Mo.App.1915); Schneider v. Johnson, 161 Mo.App. 375, 383, 143 S.W. 78, 81 [4] (1911).

Since the record shows that the preliminary injunction issued by stipulation simply to maintain the status quo, the issuance of that writ was proper, although the issuance of the permanent writ cannot be sustained. We decline to reverse the case outright; it appears that plaintiffs may have misconceived their theory, and it seems almost certain that all the evidence available was not presented. The cause is therefore reversed and remanded, with leave to plaintiffs to amend their petition, if they be so advised. Further, since it appears that defendant inadvertently omitted filing an answer while represented by other counsel, defendant should be given leave to file an answer and counterclaim within the time prescribed by law after amendment of the petition, or within a reasonable time if the petition is not amended, if he desires to do so. See First Nat'l

Bank of West Plains v. King, 363 S.W.2d 590, 598 [7] (Mo.1963); Lebcowitz v. Simms, 300 S.W.2d 827, 831 [9] (Mo.App. 1957). It is so ordered.

TITUS, C. J., and STONE, J., concur.

BILLINGS, J., not participating because not a member of the court when the cause was submitted.