EARLEY FORD TRACTOR,
INC., Plaintiff,

v.

HESSTON CORPORATION, Defendant.

No. 82–6089 CV–SJ.

United States District Court,
W.D. Missouri,
St. Joseph Division.

Jan. 31, 1983.

---

Duane Fox, Paul G. Schepers, Burrell, Seigfreid & Bingham, Kansas City, Mo., for plaintiff.

John C. Dods, III, Diane Parrish, Shook, Hardy & Bacon, Kansas City, Mo., Richard Hrdlicka, Newton, Kan., Larry Sanford, Hesston, Kan., for defendant.

## MEMORANDUM AND ORDER GRANTING PRELIMINARY INJUNCTION

SACHS, District Judge.

This antitrust case brought under Section One of the Sherman Act, 15 U.S.C., was filed by a farm implement dealer ("Earley") against one of its major suppliers ("Hesston"), which is in the process of terminating the dealership agreement because the dealer refuses to take on a new product of the supplier. The "sales and service agreement" requires that dealers stock substantially a full line of the supplier's products. Hesston is seeking to expand into the tractor market, and its salesman, on several occasions, has threatened Earley with termination if Earley declined to purchase tractors. Earley prefers to continue its established practice of selling Ford tractors exclusively but remains on the lookout for another supplemental tractor line more to its taste than the Hesston tractor. Earley also wants to continue with its successful marketing of other Hesston products, which it has stocked for about a decade. These may be generally categorized as hay mowers, balers and hay processing implements. Except for the overlay of the dealership relationship, the Court is presented, therefore, with a classic tying agreement controversy, in which the hay-related implements are being used to achieve economic leverage, and to which Hesston seeks to tie its new line of tractors.[1]

One way of stating the question is whether Hesston is entitled to enforce its contract rights and to insist on loyalty from its dealers. Viewing the matter as essentially a sales arrangement, however, the facts presented at a preliminary injunction hearing persuade the Court that Earley has a good chance to prevail ultimately on its contention that the antitrust laws are being violated and that the pertinent equities au-

---

1. Hesston has been acquired by the Italian firm, Fiat, which is seeking to introduce Fiat tractors into the American market.

thorize and indeed require issuance of a preliminary injunction maintaining the supply arrangement during the course of litigation. It is believed by the Court that the injunctive aspects of the litigation can probably be brought to a final hearing within three to nine months, depending on the scope of discovery and the sweep of issues deemed pertinent to a final ruling. There is very little indication that the Court will be faced with complex contested facts.

In considering the present posture of the case, the Court relies on the following facts, in addition to the basic facts stated above:

1. Earley was established in 1968 as a Ford tractor dealership (with "Ford Tractor" as part of its name) and thereafter added other lines of farm equipment.

2. Earley first purchased machinery from Hesston in 1970 and has purchased machinery and parts from Hesston continuously since that time under consecutive dealership agreements, the most recent being the "Hesston Agricultural Sales and Service Agreement" dated November 13, 1980. The agreement provides, in part:

Dealer agrees to order, keep on hand and display a representative sample of each type of Hesston products applicable to dealer's trade area.

3. Earley was the first dealer to introduce Hesston machinery to its trade area, being the Missouri counties of Daviess, DeKalb, Caldwell, Clinton and portions of Clay and Ray.

4. The Hesston trademark and Hesston machinery bearing the Hesston trademark used in harvesting and processing of hay have become popular with farmers in Earley's market area and are perceived to be unique and superior machines by the farmers in that trade area who have purchased them.

5. At this time Hesston machinery has strong economic power in Earley's trade area.

6. Earley's sales of Hesston products constitute the following percentages of the following markets in Earley's trade area:

a) 50% of the large round hay baler market;

b) 25% of the mower-conditioners for hay;

c) 50% of the hydro swing hay conditioners; and

d) 50% of the self-propelled windrowers, also used for hay.

7. Hesston machinery sales by Earley were approximately $320,000 during 1982; over 90% of those sales proceeds were attributable to the four types of Hesston products referred to in paragraph six above.

8. Earley sells and services practically all the equipment necessary to provide the farmers in its market area with all of their crop farming requirements.

9. When customers come to Earley to purchase Hesston machinery they often purchase then, or at a later date, other manufacturers' products from Earley in addition to the Hesston machinery. Loss of the Hesston line will thus result in loss of sales over and above the lost Hesston sales.

10. Hesston salesmen have told Robert D. Earley, president of Earley, that the dealer is one of the most successful retailers of Hesston products in the state of Missouri; in 1976–77 Earley had more large round hay baler sales than any other Hesston dealer in North America.

11. In 1979, Fiat Corporation acquired controlling interest in Hesston and started marketing in the United States, through Hesston, its Italian-made line of tractors, which were marketed in the United States as Hesston tractors.

12. Initially Hesston's salesmen encouraged Earley to purchase the Hesston tractor through conventional marketing techniques consisting primarily of sales meetings where the salesmen attempted to convince Earley of the merits of carrying the Hesston tractor.

13. Earley resisted the efforts of Hesston salesmen to sell Hesston's tractors to Earley through conventional sales techniques and did not purchase any of the tractors.

14. In 1981, or early 1982, the salesmen from Hesston began threatening that Hesston might have to find another dealer to market the Hesston line of machinery if Earley did not market their tractors.

15. Don Kothe, Hesston's district salesman, stated on several occasions in the spring of 1982 that "things will happen" to Earley if Earley continued to refuse to buy and stock the Hesston tractor. This was reasonably believed to refer to a termination of the dealership, as purportedly authorized on 30 days' notice by the dealership agreement (increased to 90 days by R.S.Mo. § 407.405).

16. Although available to testify, Kothe was not called by defendant at the hearing on the preliminary injunction to deny the testimony of Robert D. Earley.

17. Earley's decision not to purchase the Hesston tractors was based upon a number of reasons, including:

a) Earley would have to divert capital from its Ford tractor sales operation to finance the purchase of the Hesston tractors and an inventory of parts, the training of sales and service personnel and the marketing effort to sell the Hesston tractors;

b) any sales of Hesston tractors would not be likely to increase Earley's total tractor sales but would more probably decrease the total number of sales of Ford tractors, in which Earley has already made a substantial investment;

c) Earley believes the Hesston tractor is neither innovative nor an improvement over other tractors on the market; and

d) adding the Hesston line would foreclose the possibility of Earley adding some tractor line that later may be available and may be an innovation or improvement over the Ford tractors carried by Earley, for it would not be feasible to carry more than two competing tractor lines.

18. After being informed that the dealership would be terminated, and receiving a letter to that effect dated September 20, 1982, Earley, through counsel, sought a statement of reasons for the termination. Hesston's attorney referred solely to Earley's failure to buy and stock Hesston tractors, as confirmed by letter dated October 26, 1982. Although other minor disputes may have arisen during the period of the dealership, the failure to purchase and stock Hesston tractors was clearly the reason for termination.

19. Since the termination letter, Earley has asked to place orders for Hesston machinery but Hesston has refused to take such orders.

20. It is essential to the continued viability and success of Earley's Hesston business that Earley be allowed to place orders now for machinery to be delivered for sale to customers in 1983.

21. The Hesston tractors that Hesston has tried to force upon Earley would cost about $20,000 per tractor. To successfully market the tractor Earley would need to carry a representative sample, which would be at least eight of the tractors, plus parts, for a total cost of at least $210,000. Earley currently has 16 new Ford tractors in its inventory.

22. Carrying a representative sample of the Hesston tractors would foreclose a not insignificant amount of Earley's other tractor sales because of the capital Earley would have invested in the Hesston tractors.

23. On November 9, 1982, an advertisement appeared in the *Cameron Shopper,* a Cameron, Missouri newspaper, announcing the establishment of Sharp Implement and Tractor Company as the new Hesston dealer in Earley's trade area.

24. Loss of the Hesston dealership would preclude Earley from obtaining parts for servicing Hesston products previously sold by Earley, would increase the cost of obtaining such parts through Hesston dealers, and would delay parts delivery and interfere with servicing, thus causing loss of income and loss of good will and credibility of Earley as a new equipment dealer and source of servicing.

25. Hesston may not be insisting on Earley's purchasing and stocking more than two of its tractors. While this would reduce portions of Earley's financial commitment it would probably not be feasible in that it would greatly increase the ratio of fixed and incidental costs per tractor, including transportation, parts, and training of personnel. While there is testimony that other dealers have stocked as few as two such tractors, this does not establish economic feasibility of such tractor sales methods, in that other dealers may, if not pressured, have preferred not to do business in Hesston tractors. Stocking two tractors may simply have been considered the lesser of two evils by the other dealers.

26. Hesston has adopted a policy of cancelling dealerships when the dealer refuses to stock Hesston tractors in addition to other Hesston implements. Approximately 600 dealers throughout the country have agreed to stock Hesston tractors. Approximately 150 dealers have refused; most of the latter group have been terminated.

27. Hesston has gross sales of $250 million annually and ranks seventh or eighth in sales in the farm implement industry. A decision was made in the early 1970's that Hesston's long-term future in the industry depended upon its adding a tractor line. The Fiat tractor is just beginning to penetrate the tractor market. Four were sold in Missouri in 1981 and eleven in 1982. Hesston's share of the tractor market remains slightly under 1%.

28. Hesston's practice is to establish one dealer in each market area, which simplifies distribution and sales contacts. The testimony did not establish, however, that designation of two dealers in an area would appreciably increase costs or otherwise produce inefficiencies in the short-run, for example, during one marketing year.

Turning to legal analysis, the Court is guided by the Eighth Circuit's most recent formulation of tests to be used in considering an application for preliminary injunction. *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981). The Court is required to consider "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest". *Id.* at 113. "[N]o single factor is determinative" and the ultimate question is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined". *Id.*

Questions of irreparable harm and the balancing of harms in cases challenging dealership cancellations under the antitrust laws have proved troublesome. If appellate decisions can be reconciled, it would appear that deference to district court analysis is perhaps the most common feature of such decisions. *See Rittmiller v. Blex Oil, Inc.,* 624 F.2d 857, 861 (8th Cir.1980). In the present case, it might be surmised that treble damages would adequately compensate plaintiff, and would serve in effect as liquidated damages for good will loss, servicing problems, and the like. But plaintiff has satisfied the Court that certain losses would occur that probably cannot be established satisfactorily for recovery as damages; at this point it would seem that the burden of going forward on the balance of harms issue would shift to the defendant. Not unexpectedly, defendant has not mapped out with any particularity how plaintiff would go about establishing sufficient damages from cancellation of the dealership so that the sufficiency of such damages, trebled, would clearly outweigh losses in future income that cannot be satisfactorily traced to the cancellation. In this case, as in some others, the Court might speculate that its granting of a preliminary injunction may ultimately redound to defendant's favor, in that treble damages might ultimately prove to be stronger medicine than an injunction. But certain inadequacies of the legal remedy being apparent, it cannot be ruled with any assurance that the ultimate legal remedy would be adequate.

Balancing harms rather clearly favors plaintiff in this case. While a dual distribu-

torship may be less than the ideal method of selling in the Cameron, Missouri, market area, there is no indication that a relatively brief doubling up of distributors will be materially harmful to defendant. The Court would suppose that a $10,000 bond would more than adequately cover the harm to defendant, and such a bond will be required.

The public interest in this case is not a significant factor, either way.

The Court's decision in this case turns on "probable success on the merits." If the likelihood of success were minimal, that would suffice to deny interim relief here. But if, as is now concluded, plaintiff has a very substantial case, with the likelihood of success probably exceeding 50%, the Court's granting of a preliminary injunction seems clearly mandated. As shown below, the odds presently favor plaintiff, although the Court disclaims any intention of prejudging the case or going beyond the tentative evaluation necessary in this posture of the case. *See Rittmiller, supra,* at 863 n. 6.

Tying agreements have been repeatedly ruled restraints of trade that are *per se* violations of the Sherman Act, *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); *Northern Pacific Ry. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947), and stand generally condemned under the declaration of Justice Frankfurter that they "serve hardly any purpose beyond the suppression of competition." *Standard Oil Company v. United States,* 337 U.S. 293, 305, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949).[2] To the extent that a seller has an attractive tying product, giving it economic power over the buyer, the seller can, through a tying agreement, obtain leverage to overcome sales resistance in a tied product, thereby achieving an artificial advantage vis-a-vis sellers of products competing with the tied product. Competition on the merits of the products is thereby substantially hampered.

Three prerequisites must be satisfied to invoke *per se* treatment of an alleged tying agreement. First, there must be two distinct products or services. Second, the defendant must have sufficient economic power with respect to the tying product to appreciably restrain competition in the market for the tied product. Third, the amount of interstate commerce affected in the tied product must be not insubstantial. *Northern Pacific Ry. v. United States, supra,* 356 U.S. at 5–6, 78 S.Ct. at 518–19; *Rosebrough Monument Co. v. Memorial Park Cemetery,* 666 F.2d 1130, 1140–41 (8th Cir.1981).[3]

The first requirement is satisfied in the instant case by the clear differences between the farm tractors and the haying equipment. As to the question of economic

---

**2.** The Court recognizes that the "leverage" and "freedom of choice" theories underlying the law's treatment of tying agreements have been strongly questioned. *Shop & Save Food Markets, Inc. v. Pneumo Corp.,* 683 F.2d 27, 31 (2d Cir.1982) (Feinberg, Ch. J., concurring) (citing R. Bork, *The Antitrust Paradox* 365–81 (1978)); *Hirsh v. Martindale-Hubbell, Inc.,* 674 F.2d 1343, 1349 n. 19 (9th Cir.1982). *Hirsh* cites the Supreme Court's decision in *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) as being inconsistent with a *per se* ruling. *Hirsh, supra,* at 1349 n. 19. To the extent that *GTE Sylvania* may have induced expectations that the Supreme Court was likely to expand Rule of Reason analysis, that perception may have faded somewhat as a result of more recent decisions, such as *Arizona v. Maricopa County Medical Society,* —— U.S. ——, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). (*per se* rule applies to horizontal agree-

ment to fix maximum prices). Moreover, the Court of Appeals for the Eighth Circuit has recently rejected the proposition "that *GTE Sylvania* precludes the use of the *per se* rule for any vertically imposed restraint except those expressly retained by the *GTE Sylvania* decision, i.e. price fixing and resale price maintenance." *Battle v. Lubrizol Corp.,* 673 F.2d 984, 988 (8th Cir.1982). *See also: Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 167 n. 15 (3d Cir.1979). The Court will, therefore, follow the orthodox tests for analyzing tying agreements in ruling this motion.

**3.** Failure to establish the latter two elements does not preclude a plaintiff from prevailing on the merits, but merely prevents the application of the *per se* doctrine. *Fortner Enterprises v. United States Steel Corp., supra,* 394 U.S. at 499–500, 89 S.Ct. at 1256–57.

power in the tying product, this was established by the showing of market penetration in the order of 30–50% achieved by the Hesston haying equipment in Earley's trade area, presumably indicating a good product and a strong sales commitment by Earley. Earley's commitment to Hesston's haying equipment should be emphasized. Having strongly endorsed the product, Earley's credibility will be seriously damaged in seeking to sell competing products after an involuntary termination. At Hesston's invitation, Earley has tied itself firmly to the tying product. The third element is perhaps the most debatable of the three, especially if one were to limit consideration to the two Hesston tractors that Hesston claims to be in issue. But the Court concludes that more is involved. Robert Earley testified credibly that a token purchase would not be feasible, and that stocking of some eight Hesston tractors, at a total cost exceeding $200,000 would result from enforcing the demand. Moreover, Hesston's course of conduct has national impact. Hesston claims that its approximately 1% of the market for tractors is insubstantial, but this contention is not well taken. As pointed out in *Fortner Enterprises, supra,* "the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis,* is foreclosed[4] to competitors by the tie . . . ." 394 U.S. at 501, 89 S.Ct. at 1258. *Fortner* itself allegedly involved sales in the tied product of less than $200,000. *Id.* at 501–02, 89 S.Ct. at 1257–58. Hesston's tractors, with a resale price of $24,000 each (test. of R.D. Earley), and a 1% market share constitute a much larger dollar volume.

Despite Earley's satisfaction of the three prerequisites set forth above, Hesston argues that certain "exceptions" to *per se* treatment justify its actions in this case. Hesston's most appealing argument is that tying agreements should be permitted when a new product is being introduced, in order to overcome the inertia of reliance on old products. This position is not without tangential support in dicta in the cases. In *Rosebrough Monument, supra,* the Court indicated that a "compelling business justification" might allow use of tying agreements in limited circumstances, such as "when a small company has been compelled to use tying arrangements to scale high barriers of entry into a new capital intensive market." 666 F.2d at 1145. *Rosebrough* relies on almost identical language used by Chief Justice Warren in *Brown Shoe Co. v. United States,* 370 U.S. 294, 330, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962), which relies, in turn, on a "small business" distinction made by the Federal Trade Commission almost thirty years ago. *Harley-Davidson Motor Co.,* 50 F.T.C. 1047, 1066 (1954). From *Harley-Davidson* forward, however, the Court is unable to find significant successful use of the theory. In particular, no well-established company such as Hesston or Fiat has taken advantage of the "small business" exception. Moreover, Hesston has not established in this case that it faces the necessary "high barriers of entry" referred to in *Rosebrough.* The product can apparently be produced in the world market without using a tying agreement in the United States. Thus, it seems unlikely that this exception to *per se* illegality will be recognized in this case.

Hesston also places great reliance on the claimed current soundness of a statement by Chief Judge Nordbye of the Minnesota District in a 1951 decision that what the Government called "full line forcing" of farm implements "is not violative of any law." *United States v. J.I. Case Co.,* 101 F.Supp. 856, 867 (D.Minn.1951). In our view, little weight can be placed on the *J.I. Case* decision. Although Judge Nordbye was a distinguished district judge in this circuit, the modern law of tying agreements was only beginning to be formulated in 1951. The statement that full-line forcing

---

**4.** Defendant argues that there is no "foreclosure" of purchases of Ford tractors or other tractors. But the Court concludes that it may rely on economic probabilities rather than on the lack of formal restrictions in conjunction with a hypothetical expansion of the tractor market.

is permissible is unsupported by legal citation and has itself been cited only once, *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 446 n. 29 (9th Cir.1979), for the proposition that a full-line contractual requirement may not violate the law under some circumstances. In this Court's view, those circumstances probably do not include cases in which coercion is applied to secure compliance with the full-line requirement. Cf. *United States v. Parke, Davis & Co.,* 362 U.S. 29, 40–44, 80 S.Ct. 503, 509–12, 4 L.Ed.2d 505 (1960); *Colorado Pump & Supply Co. v. Febco, Inc.,* 472 F.2d 637, 641 (10th Cir.1973). In this case, plaintiff has already introduced uncontested evidence that coercion was applied by defendant.[5]

Having determined that plaintiff has demonstrated likelihood of success on the merits and that the other *Dataphase* factors favor plaintiff as well, it is hereby

ORDERED that defendant is enjoined pending litigation from terminating plaintiff's dealership agreement and from refusing to sell and provide Hesston products to plaintiff, effective upon plaintiff's posting an injunction bond in the amount of $10,000. It is further

ORDERED that any necessary discovery proceed without delay. It is further

ORDERED that, within fourteen (14) days from the date of this order, the parties submit a proposed preliminary or final discovery plan pursuant to Local Rule 15.

---

**5.** Defendant also relies on *McElhenney Co. v. Western Auto Supply Co.,* 269 F.2d 332 (4th Cir.1959). That decision, however, dealt with pleading requirements under section 3 of the Clayton Act and section 2 of the Sherman Act. The case contained no allegation or analysis of tying agreements as a violation of section 1 of the Sherman Act.