**Frank C. MAUDE, et al., Plaintiffs,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. 85–1626–CV–W–6.**

United States District Court, W.D. Missouri, W.D.

Jan. 22, 1986.

Frederick H. Riesmeyer, II, Spradley & Wirken, Kansas City, Mo., for plaintiffs.

Paul Scott Kelly, Jr., Gage & Tucker, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

SACHS, District Judge.

The principal question in this diversity case is whether § 407.405, RSMo, as enacted in 1974 and amended in 1975, contains a rule of general applicability requiring ninety days' written notice before cancellation of a Missouri franchise, regardless of the shorter period allowed in a franchise agreement. Some three years ago, I cryptically stated that this was so. *Earley Ford Tractor, Inc. v. Hesston Corp.*, 556 F.Supp. 544, 547 (W.D.Mo.1983). On further consideration, after full briefing and argument, I again so conclude.

Because defendant General Motors Corporation (GM) failed to give the requisite notice in attempting to cancel a franchise to plaintiffs, an individual (Maude) and his dealership corporation, GM will be required to reinstate the relationship and, if appropriate, give the requisite statutory notice. *ABA Distributors, Inc. v. Adolph Coors Co.*, 542 F.Supp. 1272, 1298–99 (W.D.Mo. 1982) (Oliver, Senior District Judge).

The pertinent facts are not in controversy. Maude filed this litigation in December 1985, complaining of the purported cancellation of a franchise in May 1985, his termination as the preferred or primary applicant in August, and the presently pending approval of a competing applicant, Harness, for a Chevrolet-Cadillac dealership in Warrensburg, Missouri. Maude had been scheduled to succeed a failed dealership but was frustrated in May 1985, in acquiring the dealership real estate because bankruptcy proceedings were initiated. Maude was unable to establish title to the real estate until October. Meanwhile, GM, apparently tired of the delay, had attempted to cancel the franchise to Maude and now favors the new candidate, who surfaced in August.

Counsel met with the court shortly after suit was filed and GM agreed to take no action establishing Harness as a dealer until the matter could be presented in orderly fashion. A preliminary injunction hearing was scheduled for January 18, 1986. The parties proceeded with commendable speed to conduct discovery and enter into stipulations. At the suggestion of the court both parties moved for partial summary judgment, based on the present record, to resolve pertinent legal questions under Counts I and II of the complaint with finality, insofar as they govern injunctive relief under Count V of the complaint. It is therefore possible to conclude that there are no facts material to such relief that remain in controversy and that injunctive relief should be summarily granted to plaintiffs.

The parties have stipulated to the following (omitting document identification):

1. On or about December 6, 1984, plaintiff, F.C. Maude, executed a Real Property and Asset Purchase Agreement with

Central Missouri Chevrolet-Cadillac, Inc. formerly Dick Holm Chevrolet-Cadillac, Inc.

2. The Real Property and Asset Purchase Agreement was contingent upon Mr. Maude or his designee being approved as a Chevrolet and Cadillac dealer in Warrensburg, Missouri, within 90 days of the date of the Agreement.

3. Shortly following the signing of the aforesaid Agreement, Mr. Maude contacted the Chevrolet Zone Office in Overland Park, Kansas, to discuss the possibilities of his becoming a dealer in Warrensburg, Missouri.

4. On December 20, 1984, Mr. Maude submitted an application for a General Motors Corporation Dealer Sales and Service Agreement.

5. A proposal dated January 17, 1985, was prepared by Chevrolet Motor Division, Kansas City Zone Office, for submission to the Central Office of Chevrolet proposing to change the dealer in Warrensburg, Missouri, from Dick Holm Chevrolet-Cadillac, Inc. to Pete Maude Chevrolet-Cadillac, Inc. The proposal was recommended by the Zone Manager on the same date.

6. On February 4, 1985, the plaintiffs were informed that their application and proposal to become a Chevrolet-Cadillac dealer in Warrensburg, Missouri, had been approved.

7. On February 7, 1985, the plaintiff, Pete Maude Chevrolet-Cadillac, Inc., and General Motors Corporation entered into a General Motors Corporation Dealer Sales and Service Agreement appointing Pete Maude Chevrolet-Cadillac, Inc. as a Chevrolet-Cadillac dealer in Warrensburg, Missouri.

8. On February 28, 1985, Chevrolet sent out a notice to all interested General Motors offices that Dick Holm Chevrolet-Cadillac, Inc. had been terminated as the dealer in Warrensburg, Missouri, on February 6, 1985, and that Pete Maude Chevrolet-Cadillac, Inc. was appointed the dealer on February 7, 1985.

9. A closing of the Real Property and Asset Purchase Agreement did not occur by March 6, 1985, the last date called for in the Agreement for a closing.

10. Between February 7, 1985, and March 6, 1985, the plaintiffs sold parts and performed some service work at the dealership location at 123 East Gay Street, Warrensburg, Missouri.

11. On or about March 6, 1985, the plaintiffs declared the seller in breach of the Real Property and Asset Purchase Agreement, at which time seller caused the dealership location to close for business.

12. No business was conducted at the dealership location subsequent to March 6, 1985, and throughout the remainder of calendar year 1985.

13. The plaintiff, Pete Maude Chevrolet-Cadillac, Inc., did not conduct the dealership's customary sales and service operations at any time after February 7, 1985, through and including May 8, 1985.

14. Chevrolet wholesale personnel observed the dealership building at 123 East Gay Street, Warrensburg, Missouri, for seven consecutive business days during the period of March 11 through March 18, 1985, and they found the dealership building closed.

15. On March 13, 1985, Harris H. Wilder, an attorney for plaintiffs, wrote a letter to C.C. MacLean, Business Manager of the Chevrolet Zone Office in Kansas City, informing him that the proposed sale and purchase of assets from the former dealer had not been consummated and outlining alternate plans for the plaintiff to acquire the assets including the real estate where the dealership was to operate according to the Dealer Sales and Service Agreement.

16. On April 4, 1985, Mr. E.D. Kibler, Jr., Zone Manager of the Chevrolet Zone Office in Kansas City, wrote Mr. Wilder in response to his letter of March 13, 1985.

17. The alternate plan of plaintiffs to acquire the real estate where the dealership operations were supposed to be con-

ducted was a purchase by Mr. Maude of a first mortgage on the real estate and foreclosure on the mortgage. Mr. Wilder commenced a notice of foreclosure and a foreclosure sale was scheduled to take place on May 7, 1985.

18. On April 23, 1985, representatives of the Kansas City Zone Office of Chevrolet met with Mr. Pete Maude and his attorney, Mr. Harris Wilder.

19. On May 6, 1985, the day before the foreclosure sale was to take place, Central Missouri Chevrolet-Cadillac, Inc., d/b/a Dick Holm Chevrolet-Cadillac, Inc., the former Chevrolet-Cadillac dealer in Warrensburg who controlled the dealership premises in question, filed bankruptcy.

20. On May 7, 1985, following a request of Mr. Wilder, Mr. MacLean wrote a letter to the plaintiff Pete Maude Chevrolet-Cadillac, Inc. Mr. Wilder sent a courier to pick up this letter and attempted to introduce it into evidence in a hearing before the Bankruptcy Court on May 7, 1985.

21. The filing of bankruptcy by the former dealer effectively stopped the foreclosure and the plaintiffs were unable to gain possession of the dealership premises on May 8, 1985.

22. On May 8, 1985, both Chevrolet and Cadillac Divisions of General Motors wrote letters to Pete Maude Chevrolet-Cadillac, Inc., sent by Certified Mail, Return Receipt Requested, giving notice that the Dealer Agreements were being terminated immediately upon receipt of the letter.

■ GM's purported cancellation of the Maude dealership relies on his failure to operate for seven consecutive business days, in violation of Article IV(A)(2)(i) of the Dealer Agreement. Maude contends, however, that nine months' notice should have been given, under Article IV(A)(3), requiring such extended notice when there is failure to provide "adequate premises." Because the adequacy of premises is not in question, but rather the failure to provide any place to operate the business, it appears that notice was given under the correct paragraph of the Dealer Agreement.[1] On the contract issue, therefore, GM prevails.

■ The second major issue, as phrased in my order setting hearing, was "whether the ninety day statutory requirement under § 407.405, RSMo, is superseded by deregulation as to termination notice periods under § 407.825 (listing unlawful practices by motor vehicle franchisors)." Defendant now strenuously asserts that a second aspect of the statutory question is whether there is any such generally applicable ninety day termination notice requirement in § 407.405, RSMo.

Assuming for the moment that such a period is specified for Missouri franchises in general, it seems clear that the auto dealer franchise legislation enacted in 1980 does not repeal this requirement. Such repeals by implication are disfavored. *Wright v. Martin,* 674 S.W.2d 238, 242–3 (Mo.App.1984). A review of the 1980 legislation shows that nothing therein purports to establish or reject a mandated termination period. While the scattering of pertinent statutes throughout the Missouri Revised Statutes creates traps for the unsophisticated attorney, this court is not surprised to find such inartful methods of legislating. E.g., *Drew v. Chrysler Credit Corp.,* 596 F.Supp. 1371, 1374 n. 1 (W.D. Mo.1984).

It might be argued that the 1980 legislation was an attempt to codify all pertinent Missouri statutes on automobile dealer franchises, and the omission of a provision requiring particular periods for giving termination notices could arguably be deemed significant. Just as likely, however, one might speculate that the legislators shrank from coping with a controversial subject, or

---

**1.** In the alternative, unless precluded by the parol evidence rule, it would seem that Maude was obligated to provide premises within a reasonable time. Views might differ on this subject, and I could not grant summary judgment to Maude as a matter of contract interpretation, on the present record.

were simply adopting legislation from elsewhere which did not, for one reason or another, establish periods for giving notices of termination. The 1980 statute does not on its face preclude plaintiffs' reliance on § 407.405, and I therefore turn to that statute.

Oral argument and briefing suggest, moreover, that GM's most serious contention is that I should rethink the cryptic observation in the *Earley Ford* case, and hold that § 407.405 does not really establish a ninety day notice period of general applicability. I have reconsidered the issue.

Without belaboring the legislative history of the pertinent sections, through reprinting pertinent paragraphs from the 1974 and 1975 enactments of the General Assembly, the interested reader is referred to the appendix to the Missouri Supreme Court decision in *Brown-Forman Distillers Corp. v. McHenry*, 566 S.W.2d 194, 198–200 (Mo.Sup. en banc, 1978). The 1974 text also appears in Historical Note to § 407.400, RSMo, 21 VAMS. It seems clear from the text that from the time of initial enactment of the legislation in 1974, a person who has granted a "franchise" has been prohibited from giving less than ninety days' notice of cancellation (with exceptions to be reviewed later). There has, however, been a change in the statutory definition of franchises, as set forth in § 407.400, RSMo.

The 1974 definition of franchise was quite straight-forward (clearly including motor car dealerships, for example) except that it purported to exclude "persons engaged in sales from warehouses." The 1975 revision has proved to be confusing, partly because it now contains a 38-line sentence defining the term "franchise." It seems clear, however, from the italicized portions set forth in the *Brown-Forman* case, 566 S.W.2d at 199, that the warehouse sales exclusion proved troublesome in the liquor industry, and that it became appropriate to explain what was covered in. that industry. A lengthy statement, appli-

cable only to that industry, was added to the definition. Except for the liquor industry, the coverage of the 1974 act remained intact.

This analysis of the 1975 legislation (the "liquor amendment") is consistent with an affidavit supplied in 1984 by former state Senator Spradling for use in certain state court litigation. The conclusion I reach is inconsistent, however, with an observation by Senator Spradling that the "intent" of the 1974 legislation was "to deal solely with pyramid sales schemes" and the statute "referred to franchises only in connection with their use in pyramid sales schemes." The use of an unexplained current opinion is one of the least favored methods of showing legislative history and is generally, I believe, rejected. In this case, moreover, the statement obtained is simply contrary to the text of the 1974 legislation, considered as a whole. The pyramid scheme portion of the 1974 law prohibits such schemes, and declares pyramid scheme contracts void. It is difficult to imagine why there would be a protective notice period enacted in connection with termination of a void agreement.

Contrary to the recent statement of views of Senator Spradling, the Missouri Supreme Court has already said, quite correctly, that the 1974 legislation "related to what we believe are ... two types of merchandising practices: 'pyramid sales schemes and franchise security.'" *Brown-Forman Distillers Corp. v. McHenry, supra,* 566 S.W.2d at 197. The present case involves "franchise security."

The result reached in this litigation has been repeatedly forecast, with one reported exception, by judicial decisions and commentators. *Chmieleski v. City Products Corp.,* 660 S.W.2d 275, 295 (Mo.App.1983); *Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 48 (8th Cir.1982) (Regan, Senior District Judge); Palmer and Monica, *Franchises: Statutory and Common Law Causes of Action in Missouri,* 45 Mo.L. Rev. 42, 53 (1980).[2] The only exception

---

**2.** GM contends that *Chmieleski* should also be

counted as favoring its position. The court in

**1086**

appears to be an Eighth Circuit opinion by Senior Circuit Judge Peck of Ohio, who "questioned" the applicability of the law to a beer franchise, apparently erroneously assuming that the 1975 legislation considerably narrowed the coverage of the 1974 legislation. *ABA Distributors, Inc. v. Adolph Coors Co.*, 661 F.2d 712, 715 n. 4 (8th Cir.1981). While I am of course bound to follow the Eighth Circuit, the latest controlling ruling is in *Bain.*

A post-hearing brief filed this week by GM now raises a constitutional argument. It is said that § 407.413, which is expressly limited to liquor franchises, would be in danger as a "special law" if § 407.405 were construed as being of general applicability. This belated contention has only colorable validity. In any event I would not feel authorized to misconstrue § 407.405 in order to save § 407.413.

It is therefore concluded that Maude was entitled, by statute, to ninety days' notice, unless his situation falls within one of the statutory exceptions.

■ Ninety days' notice is excused when a franchisee is guilty of criminal misconduct, has taken bankruptcy or has taken other specified actions for which immediate termination is authorized. Section 407.405, RSMo. The only conduct asserted by GM that would permit termination without notice is the alleged "abandonment" of the franchise. GM initially asserted there was an abandonment when Maude allegedly "would not or could not come up with the monies which were demanded by the seller" for the premises, or that there was an "involuntary" abandonment when the seller took bankruptcy.[3] Neither of these circumstances can fairly qualify for the statutory exception. Maude continued actively

pursuing the dealership opportunity, as it relates to the premises, until he finally obtained the premises in October 1985. The recitation of events to which the parties have stipulated is inconsistent with the contention that there was an abandonment.

■ Abandonment is largely a question of intention. *Russell v. Allen*, 496 S.W.2d 290, 294 (Mo.App.1973). The burden is on one claiming an abandonment to establish the condition by clear and unequivocal evidence. *Ibid.* Nothing has been presented which would permit a trier of fact to infer that Maude had decided neither to use nor retake the franchise. *Wirth v. Heavey*, 508 S.W.2d 263, 267 (Mo.App.1974). Even if it could be concluded that Maude should have been more generous in his business dealings with the seller, or that bankruptcy had temporarily made it impossible to operate, adopting a theory of constructive abandonment would be inconsistent with the remedial purposes of the legislation.

■ A statutory violation having been shown, I could be expected to follow Judge Oliver's view that the appropriate remedy is to reinstate the franchise until proper notice is given. *ABA Distributors, supra.* GM urges, however, that I conclude that Maude's remedy at law is adequate. Most of the cases cited deal with preliminary injunctions, where a plaintiff's claim is sometimes given quite critical analysis. Even in those cases, however, where damage remedies are uncertain or verge on speculation, relief is often given. *Earley Ford, supra.* While Maude might be able to establish in this case what his out-of-pocket losses and expenses have been, an equally significant aspect of a franchise is the element of lost profits or prospects.

that case simply said that the Missouri statutes regarding franchises are "limited," and then quoted in full § 407.405, RSMo. As I read the judicial intent, it was to point out that franchisees enjoy only limited protection, such as entitlement to a ninety day notice of termination. If it had been the intent of the court to indicate that the statute only dealt with pyramid sales or only dealt with liquor franchises it seems most unlikely that it would have found it pertinent to quote the statute at length.

3. Still another abandonment theory is presented this week. It is said that the document of February 7, 1985, was abandoned, even though plaintiffs continuously sought to save the franchise. This distinction is unpersuasive. Assuming there was a breach, and an effort to amend, that would not constitute a complete abandonment, as contemplated by the statute.

Since Maude did not in fact have an opportunity to exercise the franchise, GM would doubtless argue with some force that a claim for lost profits is speculative. It follows from such a contention that the damages allowed in a lawsuit would not be fully adequate.

It is the general rule in Missouri and elsewhere that equitable relief will be granted when a violation of law has been shown, "if the remedy at law is not clear, complete and as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *Hughes v. Neely,* 332 S.W.2d 1, 7 (Mo.Sup.1960). That is surely the case here, where a damage suit presented to a jury would not afford as adequate and effective relief as can be achieved by injunction. *See, MPI, Inc. v. McCullough,* 463 F.Supp. 887, 902 n. 18 (N.D.Miss.1978).

The prayer for relief seeks a prohibition against granting a franchise for the Johnson County, Missouri, area to anyone other than plaintiffs. Article II(I) of the Dealer Agreement provides that GM reserves the right to appoint additional dealers, but "this right will not be exercised without making a survey of marketing factors in the area of a possible new dealership location." A dealer is entitled to notice of a proposed new dealership and of "an opportunity to present information relevant to the survey." While none of the parties apparently anticipate that a Harness dealership will operate in competition with a Maude dealership, the sound way to avoid such competitive activity would be to reinstate the Maude dealership and allow (1) termination pursuant to law, as set forth in this opinion or (2) creation of a Harness dealership in Maude's territory only upon compliance with Article II(I).

It is therefore ORDERED that defendant refrain from establishing another Chevrolet-Cadillac dealership in plaintiffs' territory except in accordance with Article II(I) of the dealership agreement of February 7, 1985, or after termination of the plaintiffs' dealership in accordance with law and with this opinion. Judgment is entered in favor of plaintiffs on Count V.

Jurisdiction is retained to enforce or modify this order.