Carl Attaway **PARKS** and Bernice Parks, Plaintiffs-Appellants,

v.

Will **POINDEXTER**, et al., Defendants-Appellants,

v.

**HARTFORD ACCIDENT & INDEMNITY CO.**, Defendant-Appellee.

No. 82-8517.

United States Court of Appeals, Eleventh Circuit.

Jan. 27, 1984.

F. Marion Cummings, Glenn T. York, Jr., Cedartown, Ga., for defendant-appellee.

Groze Murphy, Jr., Rome, Ga., for Hallandale Motors.

Before ANDERSON and CLARK, Circuit Judges, and DUMBAULD *, District Judge.

DUMBAULD, District Judge:

Plaintiffs on December 14, 1978, filed a diversity action for damages caused by collision of husband plaintiff's paint truck with an auto carrier driven by defendant Will Poindexter. Husband plaintiff claimed medical expenses, and lost wages, and diminished earning capacity; wife plaintiff claimed loss of conjugal companionship.

In addition to Poindexter, various other parties were named as defendants: Ray Patterson, doing business as Ray Patterson Motors, a motor carrier; Central Indiana Leasing (a corporation set up by Patterson which owned the tractor and had leased from Patterson the trailer involved in the collision); and Hallandale Motors, of which Sidney Karp was president and which operated an automobile dealership in Florida. The defendants other than Hallandale[1] filed a third party complaint against Hartford Accident and Indemnity Company, Hallandale's insurance carrier, claiming that the policy issued by Hartford to Hallandale covered the collision involved in plaintiffs' suit and that the insurance company should defend on behalf of the defendants.

The court by order of April 24, 1981, granted Hartford's motion for severance and a separate trial on the issue of coverage. (R. vol. 5, pp. 611–12)

Trial began on July 12, 1982, and on July 15, 1982, the jury answered six interrogatories, which answers were incorporated as findings of fact in the District Court's order

Robert C. Semler, Atlanta, Ga., E. Lamar Gammage, Jr., Gerry Holmes, Cedartown, Ga., for Patterson, et al.

* Honorable Edward Dumbauld, U.S. District Judge of the Western District of Pennsylvania, sitting by designation.

1. By a stipulation approved by order of court dated June 24, 1982, Hartford withdrew its policy defenses as to Hallandale, its insured.

of August 4, 1982, (R. vol. 5, pp. 1087–1090); as amended August 9, 1982; (*ibid.* 1093–4) in which conclusions of law were set forth, and judgment entered accordingly (R. vol. 5 pp. 1091–2).

The Judgment reads as follows:

This action came on for trial before the Court and a jury, Honorable Harold L. Murphy, United States District Judge presiding, and the issues having been duly tried and the jury having rendered its verdict and the Court having rendered a decision, it is ordered and adjudged

1. As to the Third-Party Compaint [*sic*];

(a) The Third-Party Defendants [*sic*] are not entitled to lialility [*sic*] insurance coverage under the insurance policy (hereinafter the "policy") issued by Third-Party Defendant to Defendant Hallandale Motors, Inc.

(b) Third-Party Plaintiffs are not entitled to be afforded a defense by Third-Party Defendant under the policy in the underlying action for damages (hereinafter the "underlying action") instituted by Plaintiffs against Third-Party Plaintiffs (Defendants in the underlying action) and Defendant Hallandale Motors, Inc.;

(c) Third-Party Plaintiffs are not entitled to any judgment against Third-Party Defendant for any sums which may be adjudged against Third-Party Plaintiffs in the underlying action; and

(d) Third-Party Defendant shall be entitled to recover its costs of this action from Third-Party Plaintiffs.

(2) As to the Counterclaim of Third-Party Defendant and Third-Party Defendant's Claim against Plaintiffs:

(a) Third-Party Defendant has no obligation under the terms and provisions of the policy to provide a defense to Third-Party Plaintiffs in the underlying action;

(b) Third-Party Defendant has no liability under the policy to Third-Party Plaintiffs (Defendants in the underlying action) as a result of the occurrence as described in the Complaint of Plaintiffs; and

(c) Plaintiffs have no claim or right against Third-Party Defendant for the payment of any judgment that might be rendered against Third Party Plaintiffs/Defendants in the underlying action.

3. As to the relationship between Will Poindexter and Hallandale Motors, Inc.

(a) Defendant, Hallandale Motors, Inc. has no liability in this case to plaintiffs since Will Poindexter, operator of the tractor trailer which collided with plaintiff, Carl Attaway Parks was not the employee or agent of Hallandale Motors, Inc. at the time of the incident in which Mr. Parks was injured.

(b) Defendant, Hallandale Motors, Inc., shall be entitled to recover its costs of action from the plaintiff.

Appellants attack paragraph 3 of the judgment, contending that it appears to prejudge the issue of defendants' liability to plaintiffs in the underlying tort action which is still pending and undetermined, having been severed by the District Court's order of April 24, 1981, directing separate trial on the coverage issues.

In view of that severance it is clear that the judgment of August 4, 1982, did not and could not determine the underlying tort liability *vel non* of defendants to plaintiffs. The language should be interpreted as relating to the coverage questions litigated in the trial and resolved by the jury's verdict.

■ The challenged paragraph of the judgment is necessary and proper as a part of the adjudication with respect to the insurance company's liability and the scope of the coverage afforded by the policy. To relieve the insurance company from liability arising out of the collision it had to be determined that the insured, Hallandale, was not liable for any risk covered by the policy. The outcome of the trial determined this issue. All parties had ample opportunity to be heard, and were heard, on any phases of the coverage issues which they chose to present. An extensive record of 9 volumes containing 2332 pages was compiled. Whether under any legal theory

Hallandale can be found responsible for any liability which it is not insured against by the Hartford policy must await a final judgment on the postponed portion of the case.

But although it is true that, by virtue of the District Court's bifurcation order, the postponed portion of the case is still pending and undetermined, it is equally true that the disposition of the coverage portion of the case may well have substantial and significant impact upon the postponed portion of the case. That this should be so is not an unexpected or unusual result. Indeed, there would be little point in bifurcating a case unless there was a reasonable expectation that such action would expedite or facilitate disposition of the remaining segment of the case.

The effect of the coverage determination may affect the underlying tort collision case in several ways:

1. From a practical standpoint, the decision that the Hartford policy does not cover any liability for which Hallandale might be ultimately found responsible may substantially affect the course of settlement negotiations.[2]

2. The scope of the trial itself may be narrowed by reason of the outcome of the coverage trial.

The District Court's judgment resulting from the coverage trial may be utilized in a significant manner in the tort liability trial by way of res judicata, "law of the case," or collateral estoppel on certain issues. While plaintiffs remain free to litigate in the postponed phase of the case any issues which were not adjudicated (or could not have been adjudicated) in the coverage phase, defendants may plausibly argue that many important aspects of the case have been foreclosed by the outcome of the coverage phase.

In particular, plaintiffs in their briefs urge a theory of liability under Georgia law for joint unlawful enterprise. They contend that the defendants engaged in stratagems and devices to effect illegal transportation of automobiles in violation of the Interstate Commerce Act.

If plaintiffs have a viable case under that theory, they remain free to present it when the proper time comes, except to the extent it may have been foreclosed by res judicata or the "law of the case" or collateral estoppel. The extent to which those defenses may validly be asserted remains open for determination in the course of future proceedings, such determination to be made in the first instance by the District Court after affording all parties a fair and full hearing with respect to their contentions regarding the particular issues that may arise.

In that connection it should be noted that in its order of March 31, 1982, refusing to "grant summary judgment to any party" (Record, vol. 5, 962–69) the District Court discussed the Georgia statute relied on by plaintiffs, and apparently agreed with the argument by Hallandale and Hartford that causal relationship was lacking between any violation of that statute and the accident. The District Court said: "Although Hallandale may have been aware of Patterson's failure to obtain I.C.C. certification, this had no relationship to the accident." (p. 965)[3]

2. Indeed, one might speculate that the reason the coverage issue was tried first when the case was bifurcated was because plaintiffs' counsel wished the assurance of Hartford's commitment to pay any verdict obtained. Perhaps the policies covering the motor carrier defendants contained an exclusion of coverage in case of unauthorized operations. Logically, the issue of tort liability could have been tried first. If plaintiffs lost (e.g. because of contributory negligence, failure to prove defendants' negligence, or by reason of any other defense) the coverage issue would have been academic.

3. In an earlier order of September 17, 1980, the court declined to decide whether a shipper such as Hallandale was chargeable with the carrier's operation without authority in violation of the Interstate Commerce Act. Conflicting decisions on that point were cited. U.S. v. Hays Roofing & Supply, Inc., 490 F.2d 1190 (9th Cir.1974); and U.S. v. Gunn, 97 F.Supp. 476 (W.D.Ark.1950). (Record vol. 2, p. 420).

Moreover, the jury's verdict may be regarded as having resolved any conflicts between the witnesses in favor of Hallandale. Karp, the president of Hallandale, denied any knowledge of the use of the placards purporting to make the transportation private carriage by Hallandale. Karp also denies ever signing the lease which would make Hallandale responsible for the transportation.

Hence in determining the impact of the coverage trial upon the postponed portion of the case, it is possible that the District Court might find that the plaintiff's conspiracy theory has already to some extent been ruled upon, or that essential facts necessary to establish a case against Hallandale under the conspiracy theory have already been resolved in favor of Hallandale by the jury.

To the extent that issues involved in the remaining portion of the bifurcated case have in fact been litigated and adjudicated in the coverage trial (or could have been) the doctrine of issue preclusion or collateral estoppel would be applicable. *Cromwell v. County of Sac,* 94 U.S. 351, 352–53, 24 L.Ed. 195 (1877); *Chicot County Drainage District v. Baxter State Bank,* 308 U.S. 371, 375, 60 S.Ct. 317, 319, 84 L.Ed. 329 (1940); *Blonder-Tongue Laboratories v. U. of Ill. Foundation,* 402 U.S. 313, 328–30, 333, 349–50, 91 S.Ct. 1434, 1442–44, 1445, 1453–54, 28 L.Ed.2d 788; *Montana v. U.S.,* 440 U.S. 147, 153–55, 99 S.Ct. 970, 973–75, 59 L.Ed.2d 210 (1979); Restatement 2d. Judgments, § 17, § 27. On the doctrine of "law of the case" see *U.S. v. U.S. Smelting Co.,* 339 U.S. 186, 198–99, 70 S.Ct. 537, 544–45, 94 L.Ed. 750 (1950); *U.S. v. Davis,* 3 F.Supp. 97, 98–99 (S.D.N.Y.1933); *Munro v. Post,* 102 F.2d 686, 688 (C.C.A. 2, 1939); *Potts v. Village of Haverstraw,* 93 F.2d 506, 509–10 (C.C.A. 2, 1937). The scope of the trial of the underlying personal injury case may thus be affected by the outcome of the coverage litigation. The precise extent of any prior determinations which may be accorded preclusive effect in the postponed portion of the case will have to be decided in the course of further proceedings in the District Court, and we do not pass upon any such matters now.

Moreover, plaintiffs would also have to come to grips with the *Cort v. Ash* problem[4] in order to maintain a private action for violation of the Interstate Commerce Act. On its face unlawful operation without authority subjects the carrier to criminal prosecution (49 U.S.C. §§ 11903 and 11904) or to civil penalties (49 U.S.C. § 11901) or to an injunction upon suit by the Interstate Commerce Commission (49 U.S.C. § 11702). No other method of enforcement is prescribed. Nothing is said in the statute about creating tort actions for personal injuries sustained by reason of collisions with vehicles being unlawfully operated without authority.

The testimony at the coverage trial fully described the dealings of the parties. Whether their pattern of operations amounted to an unlawful conspiracy to violate the Interstate Commerce Act, or to substantive violations of that Act by any of the parties was perhaps not decided. But the facts regarding their relationships and dealings with respect to the transportation of automobiles to Hallandale's dealership from points in the Chicago area were thoroughly elucidated. Those facts can not be challenged or retried now. Their legal effect upon the underlying personal injury action remains to be evaluated at the trial of the postponed portion of the case which was severed for separate trial by the bifurcation order. To the extent that such facts are inconsistent with the indispensable elements required to establish a right to recover by plaintiffs against one or more of the defendants, the effect of the coverage trial could be detrimental to plaintiffs' position.

Indeed, it is quite possible that those facts may entitle Hallandale to summary judgment *in limine* when the trial begins. But if that result occurs, or any other outcome unfavorable to plaintiffs occurs, it will be the ineluctable result of the rules of *res*

---

4. *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) specifies criteria for determining whether a private remedy is implied in a statute.

*judicata,* collateral estoppel, and law of the case (embodying the policy that after parties have had their day in court and a full and fair opportunity of presenting their position, relitigation of the same matters should be prohibited) rather than of any error by the trial judge in the paragraph of the judgment in the coverage case which appellants assail in the instant appeal.

■ In the coverage trial the three principal actors (Karp, who desired cars to be delivered to his dealership in Florida; Patterson, who provided transportation for such cars; and Poindexter, who performed the physical movement of the merchandise), all gave their versions of their course of business. Where conflicts exist in their testimony, the jury's verdict must be taken as establishing the facts to be treated as binding by the courts.

Patterson testified that his company, Central Indiana Leasing, paid Poindexter (Tr. 44), whose compensation was computed as 22% of the gross revenue earned from the transportation on trips which he drove (Tr. 125). Karp had nothing to do with paying Poindexter (Tr. 194). Karp paid Patterson's company a flat charge per car, ranging from $180 to $225 as time went by (Tr. 45, 62).

The arrangement between Patterson and Karp was that Karp was to receive preference in use of the equipment if he could keep it busy (Tr. 63, 67).[5]

The vehicle carried a sign or placard that said Hallandale Motors (Tr. 46). Patterson said that there were several conversations with Karp, and that "He and I agreed and I had his permission to have those made." (Tr. 47).[6] The placard was not on the vehicle at the time of the accident, supposedly it had blown off (Tr. 185–87).

After Patterson had been fined for operating without authority in Florida, he prepared a lease for the purpose of avoiding the I.C.C. rules and regulations (Tr. 119–20). He sent it to Karp to be signed and said Karp told him he would sign it (Tr. 106). Poindexter told Patterson Karp had signed it, and that Poindexter had it in the truck (Tr. 90, 97). Later when Patterson looked at the document, he did not think it was a genuine signature by Karp (Tr. 91).

Patterson testified that by having a lease to the same person who owned the cars being hauled, with placard on the truck, the operation would be lawful and avoid difficulties (Tr. 212).[7]

Patterson often transported cars for other people on the back-haul from Florida. The car being transported at the time of the collision was a repossessed car being hauled for one Bob Randolph of London, Kentucky. Karp had no interest in this transaction, but made no objection when Patterson informed him that the car would be brought to Karp's lot for loading (Tr. 57, 83).

Patterson testified that Karp and Poindexter became friendly, and that, towards the latter part of the period during which cars were hauled for Hallandale, it became customary for Karp to tell Poindexter directly where to pick up cars rather than to transmit the information through channels by first telling Patterson (Tr. 48, 72).[8]

Karp testified that it was his practice always to hire someone else to transport cars to Hallandale's place of business, and

---

5. This may have been a violation of the Interstate Commerce Act [49 U.S.C. § 10741(b)], unless the service is performed by a contract carrier. See 49 U.S.C. § 10102 (14). See also 49 U.S.C. § 11903(a)(2).

6. Patterson testified that he had Karp's permission to use the sign on the vehicle, and also that he thought he had a lease agreement with Hallandale motors. (Tr. 214).

7. In other words, the transportation would be unregulated private carriage. 49 U.S.C.

§§ 10102(15), 10524; *U.S. v. Drum,* 368 U.S. 370, 82 S.Ct. 408, 7 L.Ed.2d 360 (1962).

8. The object of this testimony was doubtless to show that Hallandale was in control of the transportation and that Poindexter was its employee. However, Poindexter himself testified that the only connection Karp had with the transportation was to tell Poindexter where to pick up the cars (Tr. 251–53). Karp testified to the same effect (Tr. 320).

that he always paid on a per car basis (Tr. 313–14). At no time has he ever leased a tractor and trailer to haul cars for him, in particular from Patterson or his companies. Nor did he ever employ or pay Poindexter or any driver delivering cars to him (Tr. 314).

Karp denied agreeing to use of a placard with the name of Hallandale Motors on it (Tr. 315–16). He denied any agreement that Poindexter was to haul exclusively for Hallandale (Tr. 334). He denied signing the lease Poindexter brought him from Patterson (Tr. 337). He admits that the reason Patterson wanted the lease was to be able to haul in compliance with I.C.C. and DOT [Florida Department of Transportation] rules (Tr. 338). He admits knowing Patterson had been stopped on one occasion at the Florida border and fined $500 for lack of I.C.C. operating authority, but he did not seek reimbursement from Karp (Tr. 385–89). Karp also denied knowing that the lease Patterson sent him which he refused to sign was for the purpose of complying with the Interstate Commerce Act—"it didn't say anything about that in the papers he sent me" (Tr. 387).

From the foregoing brief synopsis of the testimony, it is clear that the jury's verdict, and the judgment of the District Court thereon, are supported by substantial evidence and free from error of law. Whatever preclusive effect or other legal consequences they may have on issues remaining for determination in the postponed portion of the bifurcated case must be decided in accordance with applicable law in the course of such future proceedings as may be had in connection with that portion of the case. The judgment of the District Court appealed from is

AFFIRMED.