694 P.2d 501

**SMITH MACHINERY CORPORATION,
Plaintiff-Appellant,**

v.

**HESSTON, INC., and Bob Estes d/b/a
Estes International Farm & Truck
Supply, Defendants-Appellees.**

No. 14772.

Supreme Court of New Mexico.

Jan. 21, 1985.

Rodey, Dickason, Sloan, Akin & Robb, Jack P. Eastham, William S. Dixon, Richard C. Minzner, Albuquerque, for plaintiff-appellant.

Sutin, Thayer & Browne, Norman S. Thayer, Marianne Woodard, Albuquerque, Jennings & Christy, K. Douglas Perrin, Roswell, for defendants-appellees.

## OPINION

SOSA, Senior Justice.

Plaintiff Smith Machinery Corporation, a farm implement dealer, sought an injunction and declaratory relief against Hesston Inc. alleging violations of motor vehicle dealer franchising requirements and practices in restraint of trade. Smith appeals the summary judgment granted Hesston by the district court as to the dealer franchising claim as well as the court's dismissal of the restraint of trade claim at the conclusion of plaintiff's case-in-chief.

## I. MOTOR VEHICLE FRANCHISING

The first issue we address is whether a piece of farm machinery called a windrower is a motor vehicle within the meaning of the Motor Vehicle Dealers Franchising Act, NMSA 1978, Sections 57–16–1 to –16·(Franchising Act), and thus whether the Act applies to dealer purchases of these windrowers.

Smith Machinery is a dealer in irrigation and farm machinery equipment. Included in its line of products is a self-propelled windrower manufactured by Hesston. The windrower is used to mow, crimp and cut hay or other crops into rows called windrows from which the crop may be picked up and compacted into bales. The windrower consists of a power unit with a detachable header in front which is the mechanism that actually mows the crops.

In its complaint, Smith alleged that under Section 57–16–5(A) of the Franchising Act, it was improper for Hesston, as the manufacturer, to coerce Smith to order motor vehicles it did not voluntarily request. Hesston moved for and was granted summary judgment on grounds that these provisions were inapplicable since Smith was not a motor vehicle dealer and Hesston did not sell motor vehicles to Smith within the meaning of the Franchising Act.

The Act applies to "all persons, manufacturers, representatives, distributors and dealers and to all written or oral agreements between a manufacturer, distributor or representative with a motor vehicle dealer * * *." NMSA 1978, § 57–16–2. The Act defines "motor vehicle" as "every self-propelled vehicle by which a person or property may be transported on a public highway and having two or more wheels." NMSA 1978, § 57–16–3(A).

■ In construing the meaning of the statutes in question, the central concern is to determine and give effect to the intention of the Legislature. *Arnold v. State,* 94 N.M. 381, 610 P.2d 1210 (1980). While

the inquiry into legislative intent begins with a review of the language employed in the act or statute in question, the history and background of the legislation is also instructive in determining intent. *See id.; Munroe v. Wall*, 66 N.M. 15, 340 P.2d 1069 (1950). Our inquiry therefore only begins with a review of the statutory language. "Our duty is to find that interpretation which can most fairly be said to be imbedded in the statute in the sense of being most harmonious with its scheme and with the general purpose of the legislature." *Pittsburg and Midway Coal Mining Co. v. Revenue Division, Taxation and Revenue Dept.*, 99 N.M. 545, 660 P.2d 1027 (Ct. App.), *cert. quashed*, 99 N.M. 644, 662 P.2d 645 (1983).

The legislative history of the definition of "motor vehicle" in the Franchising Act is brief. The definition was first codified in 1973 (NMSA 1953, Section 64–37–3) and has remained unchanged except for a 1977 amendment which substituted "two" for "four" in reference to the minimum number of wheels required for a motor vehicle.

For purposes of our inquiry here, the only relevant construction concerning the scope of coverage of the Franchising Act appears in an opinion reported by the Attorney General. AG Op. No. 74–25 (1974). The issue addressed by that opinion was whether The New Mexico Motor Vehicle Act, NMSA 1953, Sections 64–37–1 to –16, the predecessor to the present Franchising Act, applied to "manufacturers * * * and dealers of self-propelled agricultural machines and equipment which may travel upon the public highways of New Mexico." *Id.* at 49. The opinion generally concluded that the Motor Vehicle Act did extend to this type of machinery. Smith argues the Legislature tacitly confirmed this view because after the opinion issued, the Legislature only amended the definition of motor vehicle to include units with two wheels without making any other changes regarding the scope of coverage suggested by the opinion.

In reaching its conclusion, however, this brief opinion relies solely upon cases from other jurisdictions dealing with farm tractors and their inclusion as vehicles under statutory schemes far removed from the one before us. *See e.g., American Mutual Liability Insurance Co. v. Chaput*, 95 N.H. 200, 60 A.2d 118 (1948) (farm tractor is a motor vehicle within the meaning of financial responsibility act); *Keller v. Wellensiek*, 186 Neb. 201, 181 N.W.2d 854 (1970) (tractor is a vehicle under statutes regulating the use of motor vehicles on public highways); *Hessler v. Ford*, 225 Iowa 1055, 125 N.W.2d 132 (1963) (farm tractor is a motor vehicle within the automobile guest statutes). Moreover, the remaining cases cited by the opinion involved statutory schemes which exclusively regulated highway use and not, as with the Franchising Act, the business relationships between manufacturers, dealers and consumers of motor vehicles. In addition, the definitions within those statutory schemes did not include the elements that persons or property be transported or that the machinery be used on public highways as required by Section 57–16–3(A) of the Franchising Act.

That the Attorney General's opinion relied solely upon cases involving agricultural farm tractors is an additional firm basis for distinction. The windrower unit is hardly comparable to the general purpose agricultural tractors found to be motor vehicles by the opinion. The record here indicates that agricultural tractors are general purpose machines used to power or tow various types of other agricultural implements. By contrast, the unit which powers the windrower in question, while detachable, is incompatible with other agricultural machinery. The record in fact indicates that when the windrower header unit is detached from the power unit the windrower becomes unstable and is not suitable for operation. As the opinion itself concludes, there may be certain exceptions which apply and which must be evaluated on a case-by-case basis. We approve of this *ad hoc* approach and adopt it for this and subsequent cases seeking to determine coverage of the Franchising Act.

The motor vehicle definition found in Section 57-16-3(A) of the Franchising Act incorporates portions of definitions found in related statutes which have been previously construed by New Mexico courts. For purposes of fettering out the Legislature's intent in formulating this definition, it is instructive to refer to these definitions and cases interpreting them.

In the Motor Vehicle Code, "motor vehicle" is defined in part as "every vehicle which is self-propelled." NMSA 1978, § 66-1-4(B)(39)(Repl.Pamp.1984). "Vehicle" is defined in part as "every device in, upon which or by which, any person or property is or may be transported or drawn upon a highway, including any frame, chassis or body of any vehicle or motor vehicle * * *." NMSA 1978, § 66-1-4(B)(74)(Repl.Pamp.1984).

The question whether any particular piece of machinery is a "vehicle" under the Motor Vehicle Code has been addressed in few New Mexico cases. In *Kaiser Steel Corp. v. Revenue Division, Taxation and Revenue Dept.*, 96 N.M. 117, 628 P.2d 687 (Ct.App.), *cert. denied*, 96 N.M. 116, 628 P.2d 686 (1981), a question presented was whether certain pieces of equipment were vehicles exempt from registration under the Motor Vehicle Code. Exemption would have provided the basis for a substantial tax deduction. The machinery included a dragline and a continuous miner. The dragline structure was used for excavating large quantities of dirt and rock as part of the process of exposing coal for mining. It was powered by electricity provided by large trailing cables. The continuous miner was a coal mining machine mounted on caterpillar-type treads. It was used for underground mining and was also electrically powered by a trailing cable.

The Court of Appeals concluded that the machinery was not a vehicle within the meaning of that statutory scheme. Initially, the *Kaiser* record did not establish that the machines in question were capable of moving persons or property upon a highway as required by the statutory definition. Neither was there any indication that the pieces were self-propelled since their electrical power was provided by trailing cables. The court therefore concluded that the equipment could not be considered vehicles of any type under the controlling definitions.

Similarly, this Court in *Gibbons & Reed Co. v. Bureau of Revenue*, 80 N.M. 462, 457 P.2d 710 (1969), had before it the question whether a piece of mining equipment qualified for lower use tax rates. The tax reduction, as in *Kaiser*, was available to owners of vehicles exempt from registration under the Motor Vehicle Code. The mining equipment there, called a mole, moved on rail tracks and was used to transport personnel, supplies and excavated material in and out of tunnels. The Court held that the equipment did not fall within the definition of vehicle and could not therefore qualify for taxation under reduced rates available to its owners.

*Gibbons* and *Kaiser* respectively make it clear that the pieces of equipment at issue were found not to be vehicles since there was no showing that the equipment was used on highways or self-propelled. The reasoning of *Gibbons* and *Kaiser* was recently reaffirmed in *Pittsburg and Midway Mining Co. v. Revenue Division, Taxation and Revenue Dept.* There, the Court of Appeals again addressed the question whether a dragline machinery owner was entitled to certain reductions in taxes because the machinery was a vehicle. The court, following only *Kaiser* and *Gibbons*, concluded that the dragline was not a vehicle under the Motor Vehicle Code and was not therefore a vehicle under the controlling tax statutes.

While the windrower here is clearly self-propelled, it is not typically used on highways. Although the unit may be transported on public roads and highways as it is moved from field to field between jobs, it is manufactured primarily for use in agricultural fields. Any highway use is purely incidental to this intended field use.

In our view the Motor Vehicle Code statutes construed and the conclusions reached in *Kaiser*, *Gibbons*, and *Pittsburg*

point to the exclusion of the windrower from the definition of "vehicle" or "motor vehicle" under the Motor Vehicle Code. This indicates the windrowers are similarly excluded under the Franchising Act since that Act utilizes definitions similar to the Motor Vehicle Code. Under our *ad hoc* approach we find the windrower is not a vehicle under the Franchising Act and is not covered by the provisions of the Act. The judgment of the district court on the motor vehicle dealer franchising claim is therefore affirmed.

## II. RESTRAINT OF TRADE

The second major issue we address is whether Hesston's requirement that Smith stock certain tractors constitutes an illegal tying arrangement in violation of the New Mexico Antitrust Act, NMSA 1978, Sections 57–1–1 to –19.

The background from which this issue arises is as follows. Smith Machinery is a well-established dealer in Hesston products. In the mid-1970's, Hesston, including its entire line of machinery, was acquired by the Italian firm, Fiat. Hesston subsequently sought to add a new tractor line manufactured by Fiat to its product mix, thereby introducing these tractors into the United States market under the Hesston label. As part of this strategy, Hesston required Smith to carry some new tractors pursuant to the dealership contract which required Smith to carry a representative line of Hesston equipment. After Smith refused to do so, Hesston first sought to limit Smith purchases of the popular windrower and other hay processing machinery. Hesston then sought to terminate Smith's distributorship altogether pursuant to the dealership agreement which allowed either party to terminate by giving thirty days notice. Smith then claimed that Hesston conditioned or tied the sale of the hay processing equipment to sale of the new tractor line and that this practice was illegal *per se.*

Section 57–1–1 of the Act provides:

A. Every contract, agreement, combination or conspiracy in restraint of trade or commerce, any part of which trade or commerce is within this state, is hereby declared to be unlawful.

B. Every contract, agreement, combination or conspiracy which controls the quantity, price or exchange of any article of manufacture, product of the soil or mine or any goods or services in restraint of trade is hereby declared to be unlawful.

This section is patterned after Section 1 of the federal Sherman Antitrust Act. 15 U.S.C. § 1. The New Mexico Antitrust Act specifically provides that the Act is to be construed "in harmony with judicial interpretations of the federal antitrust laws." NMSA 1978, § 57–1–15 (Cum.Supp.1983). In the absence of New Mexico decisions directly on point, we look to federal cases involving allegations of antitrust arrangements under Section 1 of the Sherman Act.

█ A tying arrangement exists when a seller conditions a buyer's purchase of a desired product (the tying product) on the buyer's agreement to purchase an undesired product (the tied product). *Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). A requirement by a manufacturer that its dealers purchase all of the manufacturer's products is a tying arrangement often referred to as full-line forcing. *See Pitchford v. Pepi Inc.,* 531 F.2d 92, 100–101 (3d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976). By the same token, a requirement that only a portion of the products be stocked is referred to as representative-line forcing.

### The Applicable Standard

In this case, the district court dismissed the antitrust claim after Smith's case-in-chief on the basis that representative line contracts are an exception to the *per se* rule and therefore are not violative of state or federal antitrust laws. On appeal, Smith simply contends dismissal was improper since *prima facie* demonstration of a *per se* violation requires a full trial on the merits.

The federal courts have determined that certain trade practices have such a substantial anti-competitive effect that they are unreasonable and illegal *per se.* Such a *per se* analysis has been applied to tying arrangements since *International Salt Co. v. United States,* 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947). Tying arrangements traditionally fare poorly under the *per se* rule because they serve "hardly any purpose beyond the suppression of competition." *Standard Oil Co. of California v. United States,* 337 U.S. 293, 305–306, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). The description, underlying rationale and application of the rule is best stated in the seminal case of *Northern Pacific Railway:*

> [T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle * * * avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are * * * tying arrangements * * *. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price, but because of his power or leverage in another market. (Citations omitted).

*Id.* 356 U.S. at 5–6, 78 S.Ct. at 518.

■ To prevail on a *per se* tying claim a plaintiff must prove the existence of three distinct elements: 1) a scheme involving two distinct products whereby a buyer must purchase the tied product in order to obtain the tying product; 2) a seller possessing sufficient economic power in the tying product market to appreciably re-

strain competition in the tied product market and 3) an arrangement affecting a "not insubstantial" amount of commerce. *Fortner Enterprises, Inc. v. United States Steel Corp.,* 394 U.S. 495, 499, 89 S.Ct. 1252, 1256, 22 L.Ed.2d 495 (1969); *Northern Pacific Railway,* 356 U.S. at 6, 78 S.Ct. at 518.

■ Once these three elements have been shown, some federal courts have stated in dicta that the defendant involved in a *per se* tying arrangement may defend itself by affirmatively demonstrating a clear, legitimate business justification. *See, e.g., Brown Shoe Co. v. United States,* 370 U.S. 294, 330, 82 S.Ct. 1502, 1526, 8 L.Ed.2d 510 (1962); *Moore v. Jas. A. Matthews & Co.,* 550 F.2d 1207, 1217 (9th Cir.1977). The proponent of such a defense bears the burden of proving a business justification. *See In re Data General Corp. Antitrust Litigation,* 490 F.Supp. 1089, 1101 (N.D. Cal.1980); *United States v. Jerrold Electronics Corp.,* 187 F.Supp. 545, 558 (E.D. Pa.1960), *aff'd per curiam,* 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

Examples of business justifications for tying arrangements referred to in the cases are quality control and the preservation of goodwill, *Susser v. Carvel Corp.,* 332 F.2d 505 (2d Cir.1964), *cert. dismissed,* 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); establishment of an entirely new industry, *United States v. Jerrold Electronics Corp.;* and introduction of a new product by a small company attempting to break into a new market. *Brown Shoe Co. v. United States,* 370 U.S. at 330, 82 S.Ct. at 1526, *Harley Davidson Motor Co.,* 50 F.T.C. 1047, 1059–60, 1066 (1954).

■ Such justifications, as possible exceptions to the application of the *per se* rule, will be narrowly construed. *See Data General,* 490 F.Supp. at 1101. For example, the quality control or new business justifications will fail where there are alternatives less restrictive than tying, *see Siegel v. Chicken Delight, Inc.,* 448 F.2d 43 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1173, 31 L.Ed.2d 232 (1972), or

where the business or industry has become established. By the same token, successful use of the new product justification is very rare and may currently apply only where a smaller company can compete effectively with larger, well-established firms only by use of the tie, *Brown Shoe*, 370 U.S. at 330–331, 82 S.Ct. at 1526–27, or where barriers to entry into the new market are otherwise high. *See Rosebrough Monument Co. v. Memorial Park Cemetery Ass'n*, 666 F.2d 1130, 1145 (8th Cir.1981).

Hesston asserts that a rule-of-reason analysis, instead of a *per se* analysis, should apply to determine whether a restraint of trade exists in this case. Such an analysis would entail an extensive and detailed economic inquiry into the markets for both the tying and the tied products and a balancing of the economic benefits against the harms resulting from the tie. The legality of a challenged arrangement would then turn on its demonstrated economic effects in the markets involved. This argument disregards the fact that the *per se* approach seeks to avoid precisely this type of protracted inquiry, especially where the challenged arrangement is of a type which has typically violated antitrust law. *Northern Pacific Railway.*

*Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), does not suggest, as Hesston ardently maintains, that the rule-of-reason analysis should govern. In that case the Supreme Court applied the rule-of-reason approach to a vertical territorial restriction whereby Sylvania mandated that its franchisees sell Sylvania products only from specific locations. The Court concluded that such vertical restrictions did not traditionally prove to have a "pernicious effect on competition" so as to justify application of the *per se* rule. Accordingly, the decision overruled *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), which had applied the *per se* rule to similar vertical restrictions. In so doing, the Court reverted to the standard announced in *Northern Pacific Railway* and applied in *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), for determining whether certain trade practices, including vertical territorial restrictions, would be conclusively presumed unreasonable and therefore illegal.

The rule-of-reason approach in *Continental T.V.* is inapplicable because the trade practices there are distinct from those challenged by Smith in the case before us. There is no indication that the rule-of-reason analysis has been extended to tying arrangements of the type alleged herein. We reiterate that tying arrangements generally have long been subject to *per se* analysis. *Fortner Enterprises, Inc.; Northern Pacific Railway; International Salt.* The Supreme Court has recently reaffirmed this principle. *See Jefferson Parrish Hospital v. Hyde*, 466 U.S. 2, ——, 104 S.Ct. 1551, 1556–1557, 80 L.Ed.2d 2, 11 (1984). *See also Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 344, 102 S.Ct. 2466, 2473, 73 L.Ed.2d 48 (1982).

Hesston next maintains that the tying analysis should not apply since the business relationship here is solely between a manufacturer and a dealer without directly involving the ultimate consumer. We have found no Supreme Court cases which so hold. Lower federal courts, however, have considered whether standard tying rules apply in the franchise or dealer context and have answered in the affirmative. *See Response of Carolina, Inc. v. Leasco Response, Inc.*, 537 F.2d 1307 (5th Cir.1976); *Siegel v. Chicken Delight.*

Hesston also argues that representative or full-line forcing is not illegal under any type of antitrust analysis. *United States v. J.I. Case Co.*, 101 F.Supp. 856 (D.Minn. 1951), is the sole case cited by Hesston which directly supports this proposition. There, Case required its dealers to confine purchases and sales exclusively to its machinery and required them to carry the full line of its products. The government's antitrust challenges to both the exclusive dealing and the full-line forcing requirements were rejected. We do not find *Case*

persuasive for several reasons. Initially, the decision was based primarily on exclusive dealing grounds without extended substantive analysis of the tying claim. Secondly, since *Case* was handed down, many important developments in antitrust law applicable to tying arrangements have taken place, all without significant reference to *Case*. Lastly, its disposition is consistent with modern tying analysis since the evidence did not indicate the manufacturer possessed sufficient market power or that a significant amount of commerce had been foreclosed by the tie-in. Thus, two of the three elements required for a *per se* violation were not met.

Subsequent cases do not bear out Hesston's assertion that full-line or representative-line forcing are exempt from the tying analysis. At issue in *Colorado Pump & Supply v. Febco*, 472 F.2d 637 (10th Cir.), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973), was whether a contractual requirement mandating dealer purchase of a complete line products constituted an illegal tie. There, Febco had entered into an exclusive distributorship contract containing certain territorial restrictions with a competitor of the plaintiff. As a result of the agreement, the plaintiff could no longer make direct purchases from Febco and was required instead to purchase the Febco line from its competitor at increased cost. The court applied the *per se* rule but simply concluded that there was insufficient economic power in the tying product market to appreciably restrain competition. *Id.* at 640.

Similarly, in *David R. McGeorge Car Co. v. Leyland Motor Sales*, 504 F.2d 52 (4th Cir.1974), *cert. denied*, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975), the court considered plaintiff's contention that defendant had illegally tied sales of a new line of Land Rover vehicles to sales of the popular Triumph sports car. The plaintiff dealer claimed its refusal to participate in the tie-in ultimately resulted in termination of the dealership. Rather than refusing to apply the *per se* rule, the Fourth Circuit concluded that Leyland's conduct did not tend to impede competition between the new Rover units and other vehicles in its style and price range. That was nothing more than a conclusion that a required element of a *per se* violation was lacking since the record was barren of any proof that competition had been appreciably restrained in the tied product market. *Id.* at 57–58.

The remaining cases cited by Hesston similarly apply the standard three-part *per se* test and find no antitrust violation on the basis that at least one of the required elements has not been satisfied. *Pitchford v. Pepi, Inc.*, 531 F.2d 92 (lack of significant foreclosure of commerce); *Refrigeration Engineering Corp. v. Frick Co.*, 370 F.Supp. 702 (W.D.Tex.1974) (lack of both a tie between two products and sufficient economic power asserted by seller).

Other cases affirmatively demonstrate that tie-ins analogous to that alleged in the instant case have been struck down where the *per se* test has been met. *Osborn v. Sinclair Refining Co.*, 286 F.2d 832 (4th Cir.1960), *cert. denied*, 366 U.S. 963, 81 S.Ct. 1924, 6 L.Ed.2d 1255 (1961), involved allegations of an unlawful tying arrangement. There, Sinclair had entered into a marketing agreement with Goodyear whereby Sinclair was to receive substantial commission through sale of the Goodyear line of tires, batteries and accessories from Sinclair distributors. Plaintiff Osborn operated a service station under a lease from Sinclair. Osborn alleged the lease was terminated due to his failure to purchase sufficient quantities of the Goodyear product line for resale from his station. The Fourth Circuit, utilizing the *per se* rule, found an unlawful restraint of trade which consisted of tying the sale of Goodyear products to the lease of service stations and the sale of Sinclair gasoline.

By the same token, *Brandeis Machinery & Supply v. Barber-Greene Co.*, 1973–2 Trade Cas. (CCH) ¶ 74–672 (W.D.Ky.1973), *affd.*, 503 F.2d 503 (6th Cir.1974), involved a dealer who sought to enjoin enforcement of a supplier's alleged tie-in. The dealer, in order to obtain a desirable line of asphalt

paving equipment, was required to purchase a less desirable line of stone-crushing equipment the supplier had recently acquired. The arrangement was enforced by the supplier's threat to cancel the dealership. The supplier maintained that it was necessary to concentrate its complete line with one dealer in a given market area. The district court disagreed. In issuing a preliminary injunction it stated that plaintiff had demonstrated a reasonable likelihood of success on the merits by establishing a *per se* illegal tie under *Fortner*.

Lastly, a farm equipment dealer in *Early Ford Tractor, Inc. v. Hesston Corp.*, 556 F.Supp. 544 (W.D.Mo.1983), sought to preliminarily enjoin the enforcement of an alleged tying arrangement similar to that involved in the instant case. As with Smith, the plaintiff there was a long-time dealer in Hesston machinery who was reluctant to accept the new line of Hesston/Fiat tractors notwithstanding Hesston's threat to terminate the dealership. The district court rejected Hesston's contention that the *per se* analysis should not apply. Concluding that plaintiff had demonstrated a reasonable likelihood of success on its antitrust claim, the court enjoined Hesston's proposed dealership termination pending full trial on the merits.

As the above cases make clear, there is no well-established exception to the application of the *per se* rule in the instant case. The district court therefore erred in dismissing Smith's claim on the basis of such an exception.

**Per Se Analysis**

Hesston finally maintains that dismissal was proper since Smith failed to establish the three required elements of a *per se* violation in its case-in-chief. At this stage of litigation, Smith has exclusively relied on the *per se* rule in attempting to prove an antitrust violation. The narrow issue is thus whether Smith established a *prima facie* case under this rule. We emphasize that our review of the relevant evidence is directed solely at the narrow issue presented and is not to be construed as a commentary on the ultimate merits of the antitrust claim.

As to the first required element addressed by Smith in its case-in-chief, Smith demonstrated the existence of a tie between two distinct products. The new tractors are plainly distinct from the windrowers and other hay processing equipment. Smith demonstrated it was compelled to purchase the tractors in order to obtain the windrowers and other equipment by reference to the representative-line requirement in the dealership contract. Proof of coercion is supplied by the contractual power to enforce a tying arrangement. *See Northern Pacific Railway*, 356 U.S. at 12, 78 S.Ct. at 521; *Osborn v. Sinclair Refining Co.*, 286 F.2d at 838. In addition, actual coercion was demonstrated by the fact that Hesston sought to terminate the dealership after Smith refused to purchase the new tractors.

Turning to the question of economic power in the tying products, the focus is primarily on Hesston's market share in windrowers. A market share as low as 10% can establish sufficient economic power. *Osborn v. Sinclair Refining Co.*, 286 F.2d at 838. Smith demonstrated a 30% Hesston market share in the self-propelled windrower market and a 30–40% share in the market for non-self-propelled or pull-type windrowers. As additional support for a showing of economic power, Smith maintains that a Hesston "big baler" capable of producing bales substantially larger than those of conventional balers is also being utilized as a tying product. Smith argues that the uniqueness of the "big baler" and the fact that some of its components are patented establish a conclusive presumption of economic power under *United States v. Loew's Inc.*, 371 U.S. 38, 47, 83 S.Ct. 97, 103, 9 L.Ed.2d 11 (1962). Concluding as we do that Smith's demonstration of at least a 30% market share in windrowers constitutes a *prima facie* showing of sufficient economic power, it is unnecessary to consider this latter argument.

As to whether a "not insubstantial" amount of commerce was involved in the

market for the tied product, the crucial question is whether the total amount of business foreclosed is substantial enough so as not to be considered *de minimus*. *Fortner Enterprises, Inc. v. United States Steel Corp.*, 394 U.S. at 501–502, 89 S.Ct. at 1257–58. The proper measure is the total dollar volume affected by the tie-in. Foreclosure of commerce as demonstrated by sums as low as $190,000, *see id.*, and $60,800, *see Loew's*, 371 U.S. at 49, 83 S.Ct. at 104 is sufficient to comply with this requirement. Here, Smith presented evidence that to comply with the representative-line requirement, it would be required to purchase three tractors in the first year, six in the second and nine by the third year, at a cost of approximately $35,000 per tractor. These purchases allegedly would financially preclude Smith's purchases of an equivalent number of tractors from the competitive John-Deere line, and possibly would require discontinuance of that line entirely. The commerce foreclosed was thus alleged to range from at least $100,000 in the first year to more than $300,000 by the third year. On the basis of this dollar volume, we conclude Smith has made a *prima facie* demonstration of a significant foreclosure of commerce in the tied product market. Smith also asserts that the actual dollar volume foreclosed is much larger than even these figures would suggest since representative-line forcing, used by Hesston in all states, has a substantial impact nationwide. Since *prima facie* business foreclosure has been established, we need not pass on whether this latter assertion, if supported by the evidence, could form an additional basis of proof.

■ We hold that Smith Machinery has presented a *prima facie* case of a *per se* antitrust violation. The district court's dismissal of the antitrust claim at the conclusion of Smith's case-in-chief was therefore improper. We emphasize, however, that ultimate determination of the antitrust claim must await full trial on the merits.

Summary judgment in favor of Hesston as to Smith's motor vehicle franchising claim is affirmed. Dismissal of Smith's

antitrust claim is reversed and the cause remanded to the district court for a full trial on the merits wherein the district court is to determine whether Smith's *prima facie* case is rebutted or whether any business exceptions apply.

IT IS SO ORDERED.

FEDERICI, C.J., and WALTERS, J., concur.