**SMITH MACHINERY COMPANY, INC.,**
**Plaintiff–Appellant,**

v.

**HESSTON CORPORATION,**
**Defendant–Appellee.**

No. 87–1597.

United States Court of Appeals,
Tenth Circuit.

July 7, 1989.

---

Richard C. Minzner (Joel K. Jacobsen also of Rodey, Dickason, Sloan, Akin & Robb, and John P. Eastham, Mary Catherine McCulloch, and James L. Rasmussen of Kemp, Smith, Duncan & Hammond, with him, on the briefs), Albuquerque, N.M., for plaintiff-appellant.

Marianne Woodard (Norman S. Thayer also of Sutin, Thayer & Browne, with her, on the brief), Albuquerque, N.M., for defendant-appellee.

Before HOLLOWAY, Chief Judge, and LOGAN and McWILLIAMS, Circuit Judges.

LOGAN, Circuit Judge.

In this appeal, plaintiff Smith Machinery Corporation (Smith) argues that the district court improperly granted summary judgment against it on claims that Hesston Corporation violated section 1 of the Sherman Act, 15 U.S.C. § 1, and its New Mexico antitrust law counterpart by tying sales of Hesston tractors to sales of other Hesston farm machinery, and improperly dismissed its similar claim under section 3 of the Clayton Act, 15 U.S.C. § 14. Smith also contends that a related New Mexico state court decision precluded the federal district court's grant of summary judgment on the state claim.

Smith is a Roswell, New Mexico, dealer of irrigation equipment and farm machinery serving the Pecos Valley area. In 1950, Smith began carrying a line of Hesston farm machinery, consisting primarily of hay and forage equipment. Among the most popular Hesston products were the windrowers and the big baler. Smith also has carried a variety of other agricultural equipment lines, including a full line of John Deere products, which has been Smith's principal line of farm equipment since 1962.

In 1977 Fiat Trattori S.p.A. of Italy acquired a controlling interest in Hesston. Subsequently, Fiat sought to market its tractor in the United States as part of the Hesston product line. In 1981 Hesston approached Smith about carrying the new Hesston tractors. At the time, Hesston and Smith were parties to a distributorship contract requiring Smith to "order, keep on hand and display a representative sample of each type of Hesston products [sic] applicable to [Smith's] trade area." I R. doc. 93 exh. A at 1. Smith declined to carry the tractors. According to its president, Smith refused the tractors because it already had successfully marketed John Deere tractors, the tractor market in the Pecos Valley was so saturated that any sales would be mere replacements, any sales of Hesston tractors would cut into John Deere sales and would not increase Smith's profits, and Smith's marketing efforts with regard to the John Deere tractors would be diminished. At no time did Hesston tell Smith it could not continue to carry competing lines of products.

After Smith refused the new tractors, Hesston terminated the dealership and entered into an agreement with the local International Harvester dealer to carry the Hesston line, including its tractors. Smith asserts that had it accepted the tractors, it would have incurred approximately $13,000 in costs the first year for new parts, training, and other miscellaneous expenses asso-

ciated with the tractors, and would have had to expand its showroom to create sufficient display space.[1]

After termination of its dealership, Smith filed suit in a New Mexico state district court, alleging, *inter alia,* violations of the New Mexico Antitrust Act. At the close of Smith's case-in-chief, the trial judge dismissed the state antitrust claim on the ground that representative line requirements are excepted from the general proscription of tying arrangements. While Smith appealed the decision to the New Mexico Supreme Court, it filed the instant action in federal court, alleging violations of section 1 of the Sherman Act and section 3 of the Clayton Act, seeking treble damages. Specifically, Smith claimed that Hesston illegally tied the sale of its big baler, windrowers, and parts to purchases of the new tractors.

The federal district court held that the state court dismissal of the New Mexico antitrust claim operated to bar the federal claims on the grounds of res judicata. Subsequently, the New Mexico Supreme Court reversed the dismissal of the state claim, holding that Smith's proof of Hesston's tying arrangement established a prima facie case of a per se antitrust violation. *Smith Machinery Corp. v. Hesston, Inc.,* 102 N.M. 245, 694 P.2d 501, 510 (1985). Based on that decision, this court reversed the dismissal of the federal case. *See* Order No. 83–2550, Sept. 19, 1985; *see also* I R. doc. 15. Smith then dismissed the state action, adding the state claims to the federal court action on the basis of pendent jurisdiction.

On remand the federal district court, in a thorough memorandum opinion, granted Hesston's motion for summary judgment on all claims. On the Sherman Act claim, the court reasoned as follows: Hesston's distribution practices did not constitute a per se violation because Hesston did not prohibit Smith from handling competitors'

products and thus there was not a significant foreclosure of commerce or competition; even if Smith's limited resources effectively precluded it from handling John Deere tractors the amount of commerce thereby foreclosed was not substantial; and, there was no significant danger that Hesston could obtain market power in the tied product market. The court also held that the rule of reason was not violated since Hesston's tying arrangement actually enhanced competition in the consumer market and, again, there was no danger of Hesston acquiring market power in the tied product market. Because the New Mexico Antitrust Act states that it is to be construed in harmony with federal antitrust laws, the court also granted summary judgment on the state claim in favor of Hesston. The district court dismissed the Clayton Act claim, concluding that absent any actual sale or contract for sale of the tied item, relief would not lie under the statute.

### I

Smith first contends that the New Mexico Supreme Court's ruling that Smith had presented a prima facie case of a state antitrust violation precluded the federal district court from granting Hesston summary judgment on the state claim. It urges that the doctrines of collateral estoppel, law of the case, and stare decisis bar summary judgment for Hesston. The district court held that preclusion doctrines are inapplicable in cases in which there has not been a final judgment. It also held that the law of the case doctrine does not prevent the correction of a prior erroneous ruling or apply in cases in which new evidence is presented to a court.

Preliminarily, we observe that any preclusion arguments made with regard to the state antitrust claim logically would apply to the Sherman Act claim as well. The relevant state law [2] is patterned after sec-

---

1. Allegedly, the new dealer was required to take three tractors the first year, six tractors the second year, and nine tractors the third year. According to a Hesston sales contract, a dealer would be required to pay for a tractor nine

months after shipment, although Hesston maintains that it extended these terms to assist dealers not able to make a timely payment.

2. N.M.Stat.Ann. § 57–1–1 provides that "[e]very contract, agreement, combination or conspiracy

tion 1 of the Sherman Act, and mandates a construction "in harmony with judicial interpretations of the federal antitrust laws." N.M.Stat.Ann. § 57–1–15; *see also Allen v. McCurry*, 449 U.S. 90, 105, 101 S.Ct. 411, 420, 66 L.Ed.2d 308 (1980) (state courts are obligated and able to uphold federal law); *Marrese v. American Academy of Orthopaedic Surgeons*, 470 U.S. 373, 380–81, 105 S.Ct. 1327, 1331–32, 84 L.Ed.2d 274 (1985) (state court judgment may preclude later action that is within federal courts' exclusive jurisdiction). Indeed, in *Smith* the New Mexico Supreme Court based its judgment on federal court decisions interpreting the Sherman Act. 694 P.2d at 505–10.

We think that neither collateral estoppel nor law of the case prevented the federal district court from entering summary judgment for Hesston on the state and federal antitrust claims.[3] This court and others have conditioned the invocation against a party of collateral estoppel and law of the case on that party's prior opportunity to have fully and fairly presented and argued its claims. *See, e.g., Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 480–81, 102 S.Ct. 1883, 1896–97, 72 L.Ed.2d 262 (1982) (collateral estoppel); *Willner v. Budig*, 848 F.2d 1032, 1034 (10th Cir.1988) (same), *cert. denied*, ─── U.S. ───, 109 S.Ct. 840, 102 L.Ed.2d 972 (1989); *Parks v. Poindexter*, 723 F.2d 840, 844–45 (11th Cir.1984) (collateral estoppel and law of the case); *Dynalectron Corp. v. United States*, 4 Cl.Ct. 424, 431 (1984) (law of the case), *aff'd mem.*, 758 F.2d 665 (Fed.Cir.1984). Courts also require a prior final judgment, at least on the specific issues sought to be foreclosed from relitigation, before a party may invoke collateral estoppel or law of the case. *See, e.g., Eilrich v. Remas*, 839 F.2d 630, 632 (9th Cir.) (collateral estoppel), *cert. denied*, ─── U.S. ───, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988); *R.L. Clark Drilling Contractors, Inc. v. Schramm, Inc.*, 835 F.2d 1306, 1307 n. 2 (10th Cir.1987) (law of

the case); *cf. Employees Own Fed. Credit Union v. City of Defiance*, 752 F.2d 243, 245 (6th Cir.1985) (relaxation of final judgment rule in collateral estoppel context appropriate in civil case when prior decision is "sufficiently firm to be accorded conclusive effect"). New Mexico courts impose the "full and fair opportunity to litigate" and "final judgment" requirements on the invocation of collateral estoppel. *E.g., Reeves v. Wimberly*, 107 N.M. 231, 755 P.2d 75, 78–79 (Ct.App.1988).

The New Mexico state district court had dismissed Smith's action after Smith had presented its case and before Hesston put on any evidence. The state supreme court reversed, holding that Smith had made out a prima facie case. In holding that Smith had presented a prima facie case of a per se antitrust violation, the New Mexico Supreme Court stressed that its "review of the relevant evidence [was] directed solely at the narrow issue presented and [was] not to be construed as a commentary on the ultimate merits of the antitrust claim," *Smith*, 694 P.2d at 509, 510. Further, the supreme court directed the district court on remand to hold a trial and determine "whether Smith's prima facie case [was] rebutted or whether any business exceptions [were applicable]." *Id.* at 510. Hesston's opportunity to rebut was frustrated, of course, by Smith's dismissal of the state case and its adding the state antitrust claim to its federal lawsuit.

All the New Mexico Supreme Court decided was that Smith had made out a prima facie case for a state antitrust violation. Arguably by dismissing its case after the Supreme Court ruling and before further proceedings the situation in federal court should be as if the state suit never had been filed. In any event, when the federal court in the instant action considered Hesston's motion for summary judgment, it had before it depositions and affidavits presented by both parties, as well as trial

---

in restraint of trade or commerce, any part of which trade or commerce is within this state, is unlawful."

**3.** Smith's assertion of stare decisis in the preclusion context is misplaced since that doctrine

goes to the precedential value of a prior determination, and not to the narrow inquiry of whether a party is precluded from relitigating an issue. *Cf. Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 711 (Fed.Cir.1983).

testimony from the state proceeding. The court apparently believed that even if Smith had proved a prima facie violation in the state action, such proof had been rebutted upon the consideration of a complete record. We see no compelling reasons for forbidding the district court's exercise of its summary powers merely because a different court, finding itself in a wholly different procedural posture, thought the plaintiff's case strong enough to withstand dismissal before rebuttal evidence was produced. Thus, the district court properly entertained Hesston's motion for summary judgment.

## II

### A

We next consider the district court's grant of summary judgment in favor of Hesston on the Sherman Act claim. Smith argues that the district court, by comparing Smith's case to Hesston's rebuttal evidence, impermissibly weighed competing evidence at the summary judgment stage. But as the Supreme Court recently has made clear, there is a crucial difference between weighing evidence, which a trial judge may not do when ruling on a motion for summary judgment, and determining whether there exists a genuine issue for trial. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986), the Court noted that under Fed.R.Civ.P. 56(c), "the mere existence of *some* alleged factual dispute ... will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original). In an ordinary civil case like the one before us, "[t]he judge's inquiry ... unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512. The district court's memorandum opinion indicates that it understood its assigned task. Nothing in the record indicates that the court improperly weighed Smith's evidence against Hesston's.

Smith's primary contention is that there was sufficient evidence of an illegal tying arrangement to create an issue for trial. A tying arrangement has been defined as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). This case involves a tying arrangement known as "full-line" or "representative-line" forcing, whereby a manufacturer agrees to license or franchise a dealer to sell its products, but only on condition that the dealer sell a full or representative line of those products. *See* Joffe, *Tying and Exclusive Dealing Arrangements,* 589 Practising Law Institute/Corporate Handbook Series 643 (1988); *see also* L. Sullivan, *Antitrust* § 158, at 457 (1977).

As a preliminary matter, we note that to establish a violation of section 1 of the Sherman Act, the complaining party must prove an agreement or concerted activity between separate parties to restrain trade —that is, a "contract, combination or conspiracy." *Fisher v. City of Berkeley,* 475 U.S. 260, 266–67, 106 S.Ct. 1045, 1049–50, 89 L.Ed.2d 206 (1986); *McKenzie v. Mercy Hosp. of Independence, Kan.,* 854 F.2d 365, 367–68 (10th Cir.1988). Here, Smith refused to accede to Hesston's request to carry its tractors, but a franchisee is allowed to "charge a combination between ... [the franchisor] and other franchise dealers, whose acquiescence in [the] firmly enforced restraints was induced by 'the communicated danger of termination.'" *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 142, 88 S.Ct. 1981, 1986, 20 L.Ed.2d 982 (1968) (citation omitted); *see also Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 669–70 (7th Cir.1985), *cert. denied,* 475 U.S. 1129, 106 S.Ct. 1659, 90 L.Ed.2d 201 (1986); *Black Gold, Ltd. v. Rockwool Indus., Inc.,* 729 F.2d 676, 685–86, and 732 F.2d 779, 780 (10th Cir.), *cert. denied,* 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984). Smith failed, however, to allege any sort of concerted action between Hesston and other dealers. *See* I R. doc. 29 (Second Amended

Complaint). But Hesston does not here, nor did it at the trial court level, argue that this pleading failure warranted dismissal of Smith's Sherman Act claim. Thus, we do not decide whether dismissal of the Sherman Act count on these grounds would be warranted had Hesston raised the issue, and we consider the merits of Smith's claim of a tying violation.[4]

### B

The Supreme Court has indicated that "certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable *'per se.'*" *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 9, 104 S.Ct. 1551, 1556, 80 L.Ed.2d 2 (1984). However, section 1 of the Sherman Act only prohibits "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Thus, the question of whether Hesston's alleged line forcing constitutes a "tying arrangement" is largely irrelevant. *See Jefferson Parish,* 466 U.S. at 21 n. 34, 104 S.Ct. at 1563 n. 34. Rather, "[t]he legality of [the challenged] conduct depends on its competitive consequences, not on whether it can be labeled 'tying.'" *Id.*

Line forcing, be it full or representative, is a vertical nonprice restraint—an agreement between entities at different levels of distribution that does not purport to affect prices charged for the goods.[5] *See Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 1522–23 & n. 4, 99 L.Ed.2d 808 (1988) (definition of a "vertical restraint"); *see also* Easterbrook, *Vertical Arrangements and*

*the Rule of Reason,* 53 Antitrust L.J. 135, 135 (1984). In its most recent examination of the per se illegality of vertical restraints, the Supreme Court held that an alleged agreement between a manufacturer and a dealer to terminate another dealer due to alleged price cutting was not a per se violation of section 1 of the Sherman Act. *Sharp,* 108 S.Ct. at 1521, 1525. The Court noted that "per se rules are appropriate only for 'conduct that is manifestly anticompetitive,' that is, conduct 'that would always or almost always tend to restrict competition and decrease output.'" *Id.* 108 S.Ct. at 1519 (citations omitted). Further, in analyzing the vertical nonprice restraint at issue in that case the Court was guided by certain premises: (1) ordinarily, rule of reason analysis should be employed to determine whether a practice violates the Sherman Act; (2) departure from the rule of reason must be justified by demonstrable economic effect, such as cartel facilitation; (3) antitrust law primarily is concerned with interbrand and not intrabrand competition; and (4) in evaluating vertical restraints, courts should protect the doctrine of *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), which is that vertical nonprice restraints such as exclusive territory agreements are not illegal per se and should be judged under the rule of reason. *Sharp,* 108 S.Ct. at 1520–21. The Court concluded that "economic analysis supports the view, and no precedent opposes it, that a vertical restraint is not illegal per se unless it includes some agreement on price or price levels." *Id.* 108 S.Ct. at 1525.

---

**4.** On appeal, Smith does point to deposition testimony in the record by a Hesston vice-president who admitted testifying in an unrelated trial that he was sure some dealers took on Hesston tractors under threat of termination, although he had no personal knowledge of such an occurrence. The vice-president also had admitted that Hesston had a policy of terminating dealers that refused to stock the tractors if a replacement dealer in the area could be found.

**5.** In this particular case, the alleged line forcing might better be termed a vertical "arrangement" rather than "restraint" since Smith was not prohibited from carrying the product lines of competitors as it would be under an exclusive deal-

ing arrangement, the classic "vertical restraint." Smith was "restrained," however, in the sense that it was obligated to carry a representative line of Hesston products and it could not refuse to do so without violating the terms of the distributorship contract. A "horizontal restraint," on the other hand, represents "an agreement among competitors on the way in which they will compete with one another" and is often held to be unreasonable as a matter of law. *NCAA v. Board of Regents,* 468 U.S. 85, 99, 104 S.Ct. 2948, 2959, 82 L.Ed.2d 70 (1984); *see also Business Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 108 S.Ct. 1515, 1523 n. 4, 99 L.Ed.2d 808 (1988).

■ Taking *Sharp* as our guide, and viewing the conduct before us as a vertical nonprice restraint, Hesston's line requirement is not a per se violation of the Sherman Act. Smith has not shown that such an arrangement almost always tends to restrict competition and reduce output. *Cf. id.* at 108 S.Ct. 1519. On the contrary, common sense informs us that in most cases when, as here, the manufacturer does not prohibit a dealer from carrying competing lines, line forcing enhances interbrand competition by making another tractor available for sale to the public.[6] Further, not even Smith contends that the line requirement would lower total output in the market for tractors below pre-existing levels. At worst, there simply would be a substitution of one tractor for another.

Smith argues, however, that due to its limited financial resources the line requirement would have restricted competition because every forced purchase of a Hesston tractor it made effectively would have foreclosed the purchase of a John Deere tractor. Even if this assertion were true, the argument is misplaced. The primary objective of the Sherman Act is to benefit consumers by promoting efficient and beneficial competition. *See NCAA,* 468 U.S. at 107, 104 S.Ct. at 2963; *Jefferson Parish,* 466 U.S. at 15, 104 S.Ct. at 1559; *Grappone, Inc. v. Subaru of New England, Inc.,* 858 F.2d 792, 794 (1st Cir.1988); *Westman Comm'n Co. v. Hobart Int'l, Inc.,* 796 F.2d 1216, 1220 (10th Cir.1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 1728, 100 L.Ed.2d 192 (1988). The antitrust laws were designed to protect competition, not competitors. *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962); *Grappone,* 858 F.2d at 794. In general, the broader the consumers' range of choice, the better off they are. Thus, this court has considered alleged antitrust violations "in light of [their] effect on consumers, not on competitors." *Westman,* 796 F.2d at 1220. To the extent that a manufacturer's distribution practices enhance competition in the consumer market, they should be encouraged despite their effect on suppliers and distributors operating in an intermediate distribution market. Therefore, even if proved, Smith's allegation that Hesston's line requirement would restrict its ability to carry and sell as many John Deere tractors as it wished does not establish a per se violation of the Sherman Act. Rather, Smith would have to show that Hesston's line requirement so restricted the marketing of John Deere products that it impeded competition in the consumer market. *Cf. Pitchford v. Pepi, Inc.,* 531 F.2d 92, 101 (3d Cir.) ("there can be no liability under a full-line forcing count absent a showing of foreclosure of competition in a substantial amount of commerce"), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Colorado Pump & Supply Co. v. Febco, Inc.,* 472 F.2d 637, 641 (10th Cir.) ("The mere existence of the requirement that the full line be stocked, without additional information about its competitive impact, does not suffice to establish an unreasonable restraint of trade."), *cert. denied,* 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973). This Smith failed to do.

According to uncontradicted statistics in Hesston's brief, in 1982 John Deere sold approximately thirty percent of all farm machinery in North America. Deere's share of the North American *tractor* market was estimated to be twenty-seven percent in 1980 and thirty percent in 1985. If Deere became displeased with the number of its tractors being sold by Smith because Smith also sold Hesston tractors, it had the market power and resources to distribute its products through a different outlet—ei-

---

**6.** In *Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.,* 806 F.2d 953, 957 (10th Cir.1986), we noted in dictum that procompetitive benefits arising from a challenged practice generally are disregarded under a per se analysis. However, as we observed there, 806 F.2d at 957 n. 2, the Supreme Court has indicated that "considerable market analysis," including an examination of procompetitive justifications for a questioned practice, may be necessary when determining if a practice meets the elements of the per se violation. *See NCAA,* 468 U.S. at 104 n. 26, 104 S.Ct. at 2961 n. 26; *see also Jefferson Parish,* 466 U.S. at 34–35, 104 S.Ct. at 1569–70 (O'Connor, J., concurring in judgment). The instant case is one in which it is difficult to discuss why a practice is not anticompetitive without, at the same time, discussing why it is procompetitive.

ther through another local dealer or by vertically integrating itself. Or, as actually happened here, Smith could choose to continue selling only Deere tractors and assume the risk that Hesston would take its product line to a dealer willing to carry and sell its entire line. This is precisely the type of competitive behavior the Sherman Act was designed to encourage. In fact, forcing Hesston to forego established distribution channels to introduce a new product likely would have an anticompetitive effect.

It is clear in this case that the line forcing imposed by Hesston was being used as a tool to compete, and not to restrain competition. Had Hesston not been trying to add a new product to its line with an existing distributor, but rather had come to Smith initially with its full complement of products including its tractor, it freely could have gone elsewhere on Smith's refusal to sell the whole line. Similarly, in the existing situation, we see no compelling reasons to "restrict the autonomy of independent businessmen" when it fosters competitive practices, *Westman*, 796 F.2d at 1220, simply because Smith did not wish to disturb its current product mix. It may be, as here, that a dealer may suffer a loss of profit from not being able to carry every product that it wishes. But the Sherman Act does not protect a dealer's right to maximize profits. *Cf.* L. Sullivan, *supra* p. 10, § 158, at 457 (in the line-forcing context, "[a]bsent a showing of a significant foreclosure of competitors, it is no doubt more constructive to treat the interests of the manufacturer as adequately counterbalancing the dealer's interest in a wider product choice").

The district court and both parties focused primarily on the application of *Jefferson Parish* to the facts of this case, no doubt because *Sharp* had not been decided at the time of the district court's decision. The opinion in *Sharp* did not mention *Jefferson Parish*, although we believe the analysis in *Sharp* requires a holding that line forcing is a vertical nonprice restraint that is not illegal per se.

In our view, there are compelling reasons for making a distinction between line forcing, normally viewed as a method of competing, and traditional tying practices viewed as serving "hardly any purpose beyond the suppression of competition." *Standard Oil Co. v. United States*, 337 U.S. 293, 305–06, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371 (1949). In a line forcing situation, where a dealer is serving as an intermediate link in a distribution chain, if one manufacturer is foreclosed from selling to a dealer because of the arrangement, it is likely going to find another way to take its product to market, providing a profit potential continues to exist. In such a case, there is no ultimate foreclosure to the consumer of a choice of goods. In other more traditional tying arrangements there is an ultimate foreclosure of choice to the ultimate consumer. *See, e.g., Jefferson Parish*, 466 U.S. at 5, 104 S.Ct. at 1554 (anesthesiology tied to use of hospital); *United States v. Loew's Inc.*, 371 U.S. 38, 40, 83 S.Ct. 97, 99, 9 L.Ed.2d 11 (1962) (unpopular films tied to feature films); *Northern Pac. R. Co.*, 356 U.S. at 3, 78 S.Ct. at 516 (rail services tied to transfers of land); *International Salt Co. v. United States*, 332 U.S. 392, 393, 68 S.Ct. 12, 14, 92 L.Ed. 20 (1947) (salt tied to salt machines). Thus, a foreclosure of choice to an ultimate consumer appears to be the principal key to a tie that is illegal per se. No such foreclosure occurs or is threatened in a typical line forcing situation such as that at bar.

Having said this, we believe that even if the Court were to subject manufacturer line requirements to the traditional tying analysis set forth in *Jefferson Parish*, Hesston's arrangement still would pass per se scrutiny. In *Jefferson Parish*, the Court held that to find a per se violation, a court first must determine that a substantial amount of commerce is foreclosed under the challenged arrangement, and then that it is likely the seller is forcing the tied product onto the buyer in an anticompetitive manner. 466 U.S. at 15–16, 104 S.Ct. at 1559–1560. The Court noted that the existence of market power in the tying product is a good indication that anticompetitive forcing is taking place. *Id.* at 16–

18, 104 S.Ct. at 1560–62. As our foregoing discussion illustrates, the likelihood that Hesston's policy causes *anticompetitive* forcing is virtually nil. Thus, we hold that summary judgment on Smith's per se allegations was proper. This, however, does not end our inquiry. If Smith has raised an issue of material fact under the rule of reason, summary judgment on the Sherman Act and state claim still would have been error.

### C

As stated by the Supreme Court, "the inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition or one that suppresses competition." *National Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 691, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). In other words, the rule "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed.2d 48 (1982) (footnote omitted). This inquiry normally involves an examination of a variety of actual market factors. *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918). The plaintiff, however, has the burden of showing that the challenged arrangement had an "actual adverse effect on competition." *Jefferson Parish*, 466 U.S. at 29, 31, 104 S.Ct. at 1567, 1568.

We have no trouble concluding that Smith failed to make a sufficient showing in this case. The only evidence of "anticompetitive" effect Smith offers, as discussed above, is disputed affidavit statements by one of its officers that each purchase of a Hesston tractor would preclude the purchase of a John Deere tractor. Yet, as long as Hesston's arrangement does not preclude John Deere from taking its tractors to market, either through Smith or through another distributor, competition has not been impaired; to the contrary, it has been enhanced. The fact that Smith made a conscious decision to risk the loss of the entire Hesston line by refusing the tractors, rather than give up some sales of John Deere tractors, indicates that Deere would have had no trouble finding a satisfactory outlet for its products. Based on the allegations and evidence before the district court, a reasonable jury could not have found for Smith on its Sherman Act claim and the corresponding state claim. Thus, we hold that the district court properly granted Hesston's motion for summary judgment.

### III

Smith also contends that the district court erroneously dismissed its claim that Hesston's line requirement violated section 3 of the Clayton Act, 15 U.S.C. § 14. Section 3 provides in pertinent part that "[i]t shall be unlawful for any person engaged in commerce ... to lease or make a sale or contract for sale of goods ... where the effect of such lease, sale, or contract for sale ... may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14. The district court relied on this court's decision in *Black Gold, Ltd. v. Rockwool Industries, Inc.*, 729 F.2d 676, 685 (10th Cir.), *cert. denied*, 469 U.S. 854, 105 S.Ct. 178, 83 L.Ed.2d 113 (1984), in which we held that section 3 does not cover a manufacturers' alleged wrongful refusal to deal with a customer "in the absence of an actual sale or lease to the plaintiff." If the requirement of an actual transaction applies to sales or leases, it must apply to a contract for sale as well. *See Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1389 (9th Cir.) ("Section 3 of the Clayton Act has no application in the absence of an executed agreement"), *cert. denied*, 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981).

■ Smith strenuously argues that an actual contract for sale did exist between Hesston and itself at the time Hesston attempted to enforce the line-requirement provision of the distributorship agreement. In reality, however, what existed between the two parties at that time was not a contract for sale of the "tied" goods (i.e.

the tractors), but rather a general distributorship agreement obliging Smith to carry a representative line of Hesston products. Smith refused to purchase any of the tractors. Thus, no purchase order for the tractors, which would have constituted a sales contract, was ever executed by either party. A mere franchise agreement, defining general terms and obligations of the relationship, does not rise to the level of an executed contract for sale as required by section 3.

This result may seem at odds with the purposes underlying the antitrust laws considering, as Smith argues, that a person would need to engage in "unlawful" sales in order to invoke the protection of section 3. However, as noted in *Black Gold*, 729 F.2d at 685, section 1 of the Sherman Act has been interpreted to cover wrongful refusals to deal. We do not interpret section 3 of the Clayton Act as providing a cumulative remedy, particularly when, at least for allegations of unlawful tying arrangements, the required showings under both the Sherman and Clayton Act are identical. *See id.* at 684 n. 5. The district court properly dismissed Smith's Clayton Act claim.

AFFIRMED.